1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

W. SCOTT CAMERON (Bar No. 229828)
  scameron@kslaw.com
**KING & SPALDING LLP**
621 Capitol Mall, Suite 1500
Sacramento, CA 95814
Telephone:  +1 916 321 4800
Facsimile:   +1 916 321 4900

JOHN C. RICHTER (*pro hac vice*)
  jrichter@kslaw.com
**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
Telephone:  +1 202 737 0500
Facsimile:   +1 202 626 3737

Attorneys for Defendant
NEW CINGULAR WIRELESS NATIONAL
ACCOUNTS, LLC D/B/A CINGULAR WIRELESS,
NOW KNOWN AS AT&T MOBILITY NATIONAL
ACCOUNTS LLC

## IN THE UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| CITY OF LOS ANGELES EX REL. RICHARD KNUDSEN,<br><br>        Plaintiff,<br><br>v.<br><br>NEW CINGULAR WIRELESS NATIONAL ACCOUNTS, LLC D/B/A CINGULAR WIRELESS, NOW KNOWN AS AT&T MOBILITY NATIONAL ACCOUNTS LLC; AND DOES 21 TO 30<br><br>        Defendants. | CASE NO. 2:17-CV-00816-TLN<br><br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 9(B); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:              September 7, 2017<br>Time:             2:00 p.m.<br>Courtroom:    2<br>Judge:            Hon. Troy L. Nunley |

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

  **PLEASE TAKE NOTICE** that on September 7, 2017 at 2:00 p.m. in Courtroom 2 of the Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, California, 95814, Defendant New Cingular Wireless National Accounts, LLC D/B/A Cingular Wireless, now known as AT&T Mobility National Accounts LLC ("AT&T") will, and hereby does, move the court for an order dismissing with prejudice the Complaint in Intervention, pursuant to Federal Rules of Civil Procedure 12(b)(6), and 9(b).  *See* Dkt. No. 1.

  As set forth in the accompanying Memorandum of Points and Authorities, there is good cause for the relief requested.  Plaintiff has failed to adequately plead that Defendant breached a material contractual duty, nor engaged in any fraud actionable under the California False Claims Act.

  This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declaration of W. Scott Cameron and the exhibits thereto; the pleadings and papers filed in this action; and such further argument and matters as may be offered at the hearing of this Motion.


DATED:  June 30, 2017              **KING & SPALDING LLP**



                    By: */s/ W. Scott Cameron*
                        W. Scott Cameron
                        Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................................i

I.      INTRODUCTION ...................................................................................................... 1

II.     SUMMARY OF PLAINTIFF'S ALLEGATIONS ..................................................... 2

III.    STANDARD OF REVIEW ........................................................................................ 5

IV.     ARGUMENT ............................................................................................................. 7

        A.      The City's Claims Are Precluded By The Plain Language Of The
                Contracts And AT&T's Performance Under Those Contracts .......................... 7

                1.      AT&T had no duty to provide optimization reports under
                        the plain language of WSCA I and II ................................................... 7

                2.      AT&T had no duty to provide optimization reports under
                        the plain language of the State or City contracts ................................. 9

                3.      AT&T had no obligation to provide services at the
                        "lowest available cost" ....................................................................... 9

                4.      AT&T fully met any reporting requirements as recognized
                        by the Complaint ............................................................................... 10

        B.      The City has failed to adequately plead the elements of a CFCA
                claim .......................................................................................................... 11

                1.      The City has failed to plead an objectively false claim ..................... 12

                2.      The City has failed to plead scienter................................................. 13

        C.      The City Fails to Allege Fraud with Particularity Under Rule 9(b) ................. 16

V.      CONCLUSION....................................................................................................... 19

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 6, 7

5

6

*Bell At. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 6, 7

7

*Bovee & Thill LLC v. Pearson Education, Inc.*,
  564 F.Supp.2d 199 (S.D.N.Y. 2008) ........................................................ 8

8

9

*City of Pomona v. Superior Court*,
  89 Cal. App. 4th 793 (2001) ..................................................................... 11

10

*Eclectic Props. E. v. Marcus & Millichap, Co.*,
  751 F.3d 990 (9th Cir. 2014) .................................................................... 13

11

12

*Edwards v. Arthur Andersen LLP*,
  44 Cal. 4th 937 (2008) .............................................................................. 10

13

*Eibeid ex rel. United States v. Lungwitz*,
  616 F.3d 993 (9th Cir. 2010) .................................................................... 6

14

15

*Freeman v. Allstate Life Ins. Co.*,
  253 F.3d 533 (9th Cir. 2001) .................................................................... 6

16

*George v. Auto. Club of S. Cal.*,
  201 Cal. App. 4th 1112 (2011) ................................................................. 7

17

18

*Hagood v. Sonoma Cty. Water Agency*,
  81 F.3d 1465 (9th Cir. 1996) ............................................................ 12, 13, 14

19

*Hamilton v. Greenwich Inv'rs XXVI, LLC*,
  195 Cal. App. 4th 1602 (2011), *as modified* ................................... 15, 16

20

21

*In re GlenFed, Inc. Securities Litigation*,
  42 F.3d 1541 (9th Cir. 1994) .................................................................... 17

22

*Klein v. Chevron U.S.A., Inc.*,
  202 Cal.App.4th 1342 (2012) ................................................................... 11

23

24

*Knudsen v. Sprint Communications Co., et al.*,
  Nos. C13-04476 CRB, *et al.*, 2016 WL 4548924 (N.D. Cal. Sept. 1, 2016) ......... 1, 16, 17, 19

25

*Li v. Kerry*,
  710 F.3d 995 (9th Cir. 2013) .................................................................... 6

26

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) .................................................................. 6

27

28

DMSLIBRARY01\29872439.V8

*Palacin v. AllState Insurance Company*,
   119 Cal. App. 4th 855 (2005) ...........................................................................7

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) .........................................................................17

*Scottsdale Ins. Co. v. Hudson Specialty Ins. Co.*,
   No. 15-CV-02896-HSG, 2016 WL 1169378 (N.D. Cal. Mar. 25, 2016) ...............6

*Stewart v. Am. Ass'n of Physician Specialists, Inc.*,
   No. 5:13-CV-1670-ODW, 2015 WL 134061 (C.D. Cal. Jan. 8, 2015) ...............16

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .............................................................................8

*Tarmann v. State Farm Mut. Auto. Ins. Co.*,
   2 Cal. App. 4th 153 (1991) .............................................................................16

*Tellabs, Inc. v. Makor Issues & Rights*,
   551 U.S. 308 (2007)........................................................................................14

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) .........................................................6, 12, 16, 17

*United States ex rel. Hagood v. Sonoma Cty. Water Agency*,
   929 F.2d 1416 (9th Cir. 1991) .........................................................................13

*United Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ...............................................................................13, 18

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) .........................................................................13

*United States ex rel. Hochman v. Nackman*,
   145 F.3d 1069 (9th Cir. 1998) .........................................................................13

*United States ex rel. Jamison v. McKesson Corporation*,
   748 F.Supp.2d 664 (N.D. Miss. 2011)..............................................................13

*United States ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) .........................................................................14

*United States ex rel. Lawson v. Aegis Therapies, Inc.*,
   No. CV 210-72, 2013 WL 5816501 (S.D. Ga. Oct. 29, 2013) ...........................17

*United States ex rel. Lee v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) .....................................................................13, 17

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008)....................................................................12, 13, 15

*United States v. Fulton Cty., Georgia*,
   No. 1:14-CV-4071-WSD, 2016 WL 4158392 (N.D. Ga. Aug. 5, 2016)...............17

*United States v. King Features Entm't, Inc.*,
   843 F.3d 394 (9th Cir. 1988) ............................................................................... 7

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*
   *Workers Int'l Union v. ConocoPhillips Co.*,
   No. CV 08-2068 PSG FFM, 2009 WL 1610074 (C.D. Cal. May 5, 2009) ........................... 7

*X Corp. v. Doe*,
   816 F. Supp. 1086 (E.D. Va. 1993) ...................................................................... 14

**Statutes**

28 U.S.C. § 1441(B) ......................................................................................... 5

Cal. Civ. Code § 1643 ....................................................................................... 10

California False Claims Act (Cal. Gov't Code § 12651(a)(1)) ............................................ *passim*

Federal Rule of Civil Procedure 8 ..................................................................... 6, 19

Federal Rule of Civil Procedure 9(b) .................................................. 1, 6, 16, 17, 18, 19

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 5, 6, 8

**Other Authorities**

5A Charles A. Wright et al., Federal Practice & Pro. § 1297 (3d ed. 1998) ............................. 6

DMSLIBRARY01\29872439.V8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case, originally brought by Relator Richard Knudsen, alleges that AT&T and two other major telecommunications providers all engaged in the exact same fraudulent conduct over the last decade by failing to provide "rate plan optimization" or pricing at the "lowest cost available" under their separate contracts with the City of Los Angeles ("the City").  Notably, Knudsen brought a similar false claims action on behalf of the United States that was dismissed with prejudice after several failed attempts to state a viable claim.  See *Order Granting Motions to Dismiss with Prejudice, Knudsen v. Sprint Communications Co.*, *et al*., Nos. C13-04476 CRB, *et al*., 2016 WL 4548924 (N.D. Cal. Sept. 1, 2016) ("*Knudsen I*"), attached to the Declaration of W. Scott Cameron ("Cameron Decl.") as Ex. A.  Although the City of Los Angeles ("the City") has intervened in this case, its Complaint is equally deficient as Relator's other qui tam suits.

First, the City's contract-based claims are meritless because none of the relevant contracts required AT&T to provide rate plan optimization to the City or to provide services at the "lowest cost available."   By the very terms of the contracts, any reporting obligations under these provisions plainly did not extend to political subdivisions such as the City.  Moreover, AT&T's response to the original requests for proposal ("RFP") clarified how it would satisfy any purported reporting obligations and was "expressly incorporated" into the contracts.  Complaint, at ¶ 50.  AT&T satisfied these commitments in full.  *Id.* at ¶¶ 102, 106 (acknowledging that AT&T provided information through WIN CDs, Premier, and Stewardship Reports).

Second, the City's fraud based claims are deficient as a matter of law in several fundamental ways.  The City's alleged contract breaches lack the actual "objective falsity" needed to state a claim under the California False Claims Act ("CFCA"); at most, this case involves a dispute over the nature of the parties' contractual duties and obligations.  Mere ambiguity or imprecision in a contract that leads to different, competing interpretations, however, is not sufficient to establish a fraud claim.  The City also failed to plead its fraud claims with particularity as required by Rule 9(b) of the Federal Rules.

In particular, the City fails to adequately allege the critical element of scienter, which

1  involves the *knowing* presentation of a falsehood.  The City offers nothing but conclusory

2  allegations that AT&T acted with this requisite level of scienter.  In fact, the City's complaint

3  devotes far more attention addressing all the data and information that it received from AT&T

4  and disputing whether this reporting satisfied the purported optimization reporting requirement

5  under the contracts.  *See, e.g.*, Complaint, at ¶¶ 97–107.  Again, that mere dispute over AT&T's

6  contractual obligations cannot give rise, as a matter of law, to the knowing, palpable false

7  statement required to assert a claim under the FCA.

8     Moreover, the City's Complaint is actually replete with *admissions* that *negate* scienter.

9  The City claims that in AT&T's various reporting efforts, "true rate plan optimization analyses

10  were not to be found."  However, despite this pervasive awareness that it was not receiving the

11  optimization information to which it now claims to be entitled, the City nevertheless continued to

12  do business with AT&T, including paying its wireless bills and entering into subsequent

13  contracts with the carrier.  The City's failure to identify any action it took to notify AT&T of any

14  purported contractual breach or gap in service despite having full knowledge of the issue

15  underscores that this case at most involves a post-hoc difference in interpretation of the

16  contracts.  Indeed, the City's own actions over the course of the contracts certainly did not alert

17  AT&T to any potential fraud and are entirely inconsistent with any claim of knowing fraud.

18     Accordingly, for the reasons more fully set forth below, the Court should dismiss this

19  case with prejudice.

20  **II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS**

21     The City's claims derive from alleged breaches of a series of cooperative purchasing

22  contracts executed between several governmental entities and the Carrier Defendants concerning

23  the provision of wireless telecommunications services.  *Id*. at ¶¶ 27–79.  Specifically, the City

24  identifies three "form contracts": the State of California Wireless Contract ("CWC") and two

25  Western States Contracting Alliance ("WSCA I" and "WSCA II") contracts.  *Id*. at ¶ 3.  The City

26  does not allege that it contracted with AT&T under CWC and therefore does not assert any

27  claims against AT&T on the basis of that contract.

28     As for the remaining contracts, WSCA is a cooperative purchasing organization that

1    serves to assist in the formation and administration of multi-state contracts.  Although WSCA

2    adopts master template agreements with individual telecommunications companies concerning

3    the provision of wireless services, State and local governments are required to sign a separate

4    Participating Addenda ("PA") with an individual wireless carrier in order to receive service.  *Id.*

5    at ¶ 80.  The master agreements at issue here (WSCA I and II) were originally negotiated and

6    executed by the State of Nevada.  The City's Complaint alleges that AT&T executed the WSCA

7    I contract with Nevada on or about August 31, 2006, and executed a corresponding PA with the

8    State of California on or around February 27, 2007.[1]  The City was not a direct party to any of

9    those agreements.  Rather, the City alleges that it executed an agreement with AT&T "effective

10   March 1, 2007, adopting the prices, terms and conditions stated in [WSCA I]."  *Id.* at ¶ 93.

11        The City contends that the WSCA I and II master agreements included "interlocking

12   provisions" obligating Carrier Defendants to submit "rate plan optimization reports" and provide

13   wireless services at the "lowest cost available."  *Id.* at ¶¶ 4, 11.  The purportedly "interlocking

14   provisions," however, are located in entirely different sections of WSCA I's initial Request for

15   Proposal ("RFP").  The "General Services" section of the WSCA I RFP noted that the Carrier

16   Defendants should "[p]rovide quality wireless equipment and services at the lowest cost

17   available . . ."  *Id.* at ¶ 59.  An entirely separate section requested that Carrier Defendants submit

18   "quarterly optimization report[s] for each wireless subscriber."  *Id.* at ¶ 60.  The City

19   acknowledges that AT&T responded to the WSCA I RFP by clarifying that it would comply with

20   any reporting requirement through WIN CDs and a dedicated project manager.  *Id.* at ¶ 111.  The

21   City further acknowledges that AT&T's response to the RFP was incorporated into the

22   subsequently executed WSCA agreements.  *Id.* at ¶¶ 62, 67–68.  In addition, Nevada, the Lead

23   State responsible for negotiating the contract, made clear that any optimization reports did not

24   have to be submitted to each individual participating entity, but rather "should be submitted *to*

25   *the Lead State*" (emphasis added).  *See* Amendment No. 1 to WSCA I RFP, at p. 9, attached to

26   the Cameron Decl. as Ex. E.

27   _____

28   [1]      Paragraph 81 of the City's Complaint alleges that this PA was signed in 2006.

                                                  3

1    As for WSCA II, the City alleges that AT&T executed this agreement with the State of

2    Nevada in March 2012 and that it included similar "lowest cost available" and optimization

3    reporting requirements.  Complaint, at ¶¶ 70-71, 77.  The City acknowledges that AT&T

4    responded to the RFP for WSCA II by clarifying that it would comply with any reporting

5    requirement through its Premier online platform.  *Id*. at ¶ 114.  California purportedly amended

6    or entered into a new PA around that time.[2]  *Id*. at ¶¶ 81, 89.  The City and AT&T then executed

7    a new sub-agreement, effective May 1, 2013, that referenced WSCA II and the California

8    statewide PA.  *Id*. at ¶ 94.

9    Following the execution of these contracts, the Complaint acknowledges that each Carrier

10   Defendant—including AT&T—provided at least three types of reports containing usage and

11   billing data to the City: "usage reports," "overage reports," and "report[s] used to promote new

12   rate plans or analyze possible changes."  *Id*. at ¶¶ 101, 104, 106.  The City further acknowledges

13   that AT&T provided relevant information and reports using the tools that it identified in its

14   responses to the WSCA RFPs:  namely reports through WIN CDs and Premier portal as well as

15   "Stewardship Reports" that identified wireless lines that regularly incurred overage charges.  *Id*.

16   at ¶¶ 102, 106.

17   Notwithstanding that AT&T provided information in precisely the manner it identified in

18   its RFP responses, the City claims that these reports did not satisfy its contractual duties to

19   provide optimization reports.  *Id*.  ¶ 101.  Indeed, at odds with prevailing market forces where

20   carriers vigorously compete against each other for customers and market share, the Complaint

21   alleges that each Defendant independently perpetrated the same fraud scheme against the City by

22   knowingly failing to provide the optimization reports and services at the lowest available cost.

23   *See id*. at  ¶¶ 5-6.  According to the Complaint, each Defendant "did not identify the optimal rate

24   plan for each line of service on a quarterly or other routine bas[is]" and thus did not "use those

25   rate plans to achieve the lowest cost available when invoicing the City."  *Id*. at ¶ 97.

26

27   _____
     [2] According to the Complaint, California issued a Request for Offer ("RFO") in or around 2010, "so that California-
28   specific terms could be negotiated with the WSCA Carriers for inclusion in PAs and amended PAs pursuant to what
     was then WSCA I."  Complaint, at ¶ 84.  The City similarly alleges that the RFO required "optimization reporting."
     *Id*. at ¶ 86.

1    Notably, the Complaint does not identify even a single instance prior to this lawsuit

2    where the City notified AT&T about this expansive interpretation of the contracts or raised

3    concerns about the sufficiency of the various forms of reporting that it was receiving.  Rather, the

4    City acknowledges that it continued paying invoices as it received them, and now belatedly

5    claims that it was  "overcharged" by "tens of millions of dollars" as a result of  AT&T's alleged

6    failure to prove proper optimization reporting.  *Id*. at ¶¶ 7, 136–141.  Rather than informing

7    AT&T about any concerns relating to rate plan optimization reports supposedly being withheld

8    under the contracts, the City hired a third-party firm, Communications Brokers and Consultants,

9    Inc. ("CBC"), in 2011 to perform this analysis.  *Id*. at ¶ 140.  Nowhere does the City allege that it

10   contacted AT&T seeking some different form of optimization reporting from what it was

11   receiving prior to or during its relationship with CBC.  In fact, the City renewed its service

12   agreement with AT&T in 2013 *after* the City had retained the services of CBC.  *See id*. at ¶ 94.

13       Later that same year on or about September 16, 2013, relator Richard Knudsen filed this

14   CFCA suit on behalf of the City of Los Angeles against AT&T in Los Angeles Superior Court.

15   Knudsen filed a similar false claims action in federal court on behalf of the United States against

16   AT&T that was dismissed with prejudice.  *See, generally, Knudsen I*.   Nearly three years later

17   after this litigation was originally filed, the City intervened in the litigation on or around July 11,

18   2016.  The City subsequently filed its Complaint in Intervention on September 9, 2016, alleging

19   violations of the CFCA, unfair business practices, breach of contract, and unjust enrichment

20   against several defendants: Cellco Partnership d/b/a Verizon Wireless ("Verizon"); Nextel of

21   California, Inc., d/b/a Nextel Communications and Sprint Nextel, and Sprint Solutions, Inc.

22   (collectively, "Sprint"), AT&T, and Does 1-30 (collectively, "Carrier Defendants").  Complaint,

23   at ¶¶ 142–166.  On October 7, 2016, Defendants removed this action to the Central District of

24   California pursuant to 28 U.S.C. § 1441(B).  *See* Dkt. 1.  On April 18, 2017, Judge Fischer

25   denied the City's motion to remand, but granted the City's motion to transfer venue to this Court.

26   *See* Dkt. 37.

27   **III.    STANDARD OF REVIEW**

28       A motion to dismiss under Rule 12(b)(6) should be granted where, "accept[ing] factual

NOTICE OF MOTION AND MOTION TO DISMISS: NO. 2:17-CV-00816-TLN
DMSLIBRARY01\29872439.V8

1   allegations in the complaint as true and constru[ing] the pleadings in the light most favorable to

2   the nonmoving party," the pleadings fail to state a claim upon which relief can be granted.

3   *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Pursuant to

4   Federal Rules of Civil Procedure 8 and 12(b)(6), a complaint must contain sufficient factual

5   allegations to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550

6   U.S.  544, 555 (2007) (citations omitted).  In other words, it must contain enough "factual matter,

7   accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

8   U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Mere legal conclusions, "formulaic

9   recitation of the elements of a cause of action," or "naked assertions" will not suffice.  *Id.*

10  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

11  short of the line between possibility and plausibility of entitlement to relief."  *Li v. Kerry*, 710

12  F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79).

13          Moreover, allegations of fraud must be pleaded with particularity.  Fed. R. Civ. P. 9(b);

14  *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  To satisfy this

15  additional hurdle, the complaint must allege "particular details of a scheme to submit false

16  claims paired with reliable indicia that lead to a strong inference that claims were actually

17  submitted."  *Ebeid*, 616 F.3d at 998-999.  These particulars include "matters such as the time,

18  place, and contents of the false representations or omissions, as well as the identity of the person

19  making the misrepresentation . . . and what the defendant obtained thereby."  5A Charles A.

20  Wright et al., Federal Practice & Pro. § 1297 (3d ed. 1998).  The City "must identify 'the who,

21  what, when, where, and how of the misconduct charged.'"  *United States ex rel. Cafasso v. Gen.*

22  *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

23          While Rules 8 and 9(b) set pleading standards for this action, California substantive law

24  controls the state-based claims.  *See Scottsdale Ins. Co. v. Hudson Specialty Ins. Co.,* No. 15-

25  CV-02896-HSG, 2016 WL 1169378, at *5 (N.D. Cal. Mar. 25, 2016) (citing *Freeman v. Allstate*

26  *Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001)) (noting that California law controls a contract

27  dispute in diversity jurisdiction).

28

DMSLIBRARY01\29872439.V8

**IV.   ARGUMENT**

    **A.   The City's Claims Are Precluded By The Plain Language Of The Contracts And AT&T's Performance Under Those Contracts**

As made clear by the plain language of the contracts, AT&T owed no duty to the City to submit rate plan optimization reports or otherwise provide services at the lowest available cost in the manner alleged by the Complaint.  Moreover, AT&T's clarifying responses to the WSCA RFPs described how AT&T intended to provide any reporting information through WIN CDs, Premier, and Stewardship reports, and then AT&T did exactly that as acknowledged by the City's Complaint.   Accordingly, the City's contract related claims are without any basis in law and otherwise fail to satisfy the pleading burdens under *Iqbal* and *Twombly*.[3]

        1.   AT&T had no duty to provide optimization reports under the plain language of WSCA I and II

The law is clear that a court should dismiss a complaint where the plaintiff's alleged contract interpretation is unreasonable as a matter of law.  *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, No. CV 08-2068 PSG FFM, 2009 WL 1610074, at *3 (C.D. Cal. May 5, 2009) (citing *United States v. King Features Entm't, Inc.*, 843 F.3d 394, 398 (9th Cir. 1988)).  Indeed, the Court is not required to "credit plaintiff's allegations" where contract language "unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint."  *See also  George v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 1112, 1130 (2011) (citing *Palacin v. AllState Insurance Company*, 119 Cal. App. 4th 855, 862 (2005)).  These principles squarely apply here to defeat the City's claims.  The City's tortured and selective contract interpretation notwithstanding, AT&T had no duty to provide "optimization reports" and "services at the lowest cost available."  *See* Complaint, at ¶ 159.

The text and structure of the WSCA contracts make clear that as a political subdivision the City had no contractual right to receive quarterly optimization reports from AT&T.  In fact,

---

[3] As each of the City s claims derive from the purported contractual breaches, they all fail as a matter of law.  For the additional reasons set forth below in Section IV B, the City's fraud-based claims under the CFCA also fail.

1   Nevada, the lead state negotiating the WSCA agreements, considered that very issue.  In an

2   Amendment to the WSCA I RFP, Nevada was asked whether optimization reports should be

3   submitted to the "Lead State and/or all participating WSCA States."  Nevada's response was

4   unambiguous: "Reports should be submitted *to the Lead State*."  *See* Ex. E to the Cameron Decl.,

5   at p. 9.  WSCA II similarly defined the scope of optimization reporting, and also did not require

6   the submission of optimization reports to political subdivisions like the City.

7       Other provisions of the contracts reinforce that understanding as well.  *First*, participating

8   entities to the WSCA templates were required to execute separate standalone contracts with

9   wireless carriers through PAs.  *Second*, the cooperative purchasing agreements clearly

10  distinguished between duties owed to Nevada as the Lead State, and other participating

11  government entities such as the City that executed their own PAs.  For example, the WSCA I

12  RFP contained several provisions unique to Nevada, including: a requirement for semi-annual

13  meetings with the state (§§ 3.2.1, 3.2.3.1); a requirement to notify Nevada of certain unresolved

14  issues (§ 3.9.3); and a requirement to provide equipment sales reports (§ 3.2.2.3).  *See* WSCA I

15  RFP, pp. 7–14, attached to the Cameron Decl. as Ex. B.  There were also separate provisions

16  unique to "participating entities."  *Id.*  Indeed, the RFP permitted participating entities to obtain

17  reports from Carrier Defendants *on request*.  *See, e.g., id.* ("Individual participating entities may

18  request specific equipment sales summaries").  This clear line of demarcation throughout the

19  contracts between  duties owed to the Lead State and those owed to participating entities just

20  conforms that limiting any optimization reporting requirements to the Lead State was purposeful.

21      The City ignores altogether these provisions of the WSCA contracts.[4]  Rather, the City's

22  Complaint focuses exclusively on RFP sections § 3.2.2.2 in WSCA I, § 3.3.2.2 in WSCA II, and

23  California RFO section 7.16.2, as if they existed in a vacuum.  Complaint, at ¶¶ 60, 71, 86.  That

24

25  [4] The Court may properly consider AT&T's complete agreement with the City, and not just the portions included or cited in the City's complaint.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("[I]n order to '[p]revent

26  [ ] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting … documents upon which their claims are based,' a court may consider a writing referenced in a complaint but not explicitly incorporated therein if the

27  complaint relies on the document and its authenticity is unquestioned.") (citations omitted); *see also Bovee & Thill LLC v. Pearson Education, Inc*., 564 F.Supp.2d 199, 200 (S.D.N.Y. 2008) ("On a motion to dismiss for failure to

28  state a claim, a contract integral to the complaint may be considered by the judge, who 'need not accept [plaintiff's] description' of the contract, 'but may look to the agreement itself.'") (citations omitted).

1   is entirely misleading and contrary to the text and overall structure of the WSCA contracts.  The

2   various provisions cited by Plaintiffs on their face do not require any reporting to any political

3   subdivision;  rather, when read in context of the agreement as a whole, they are entirely

4   consistent with Nevada's express acknowledgement that the contracts did not require any

5   optimization reports to any entity other than the Lead State.

6          2.   AT&T had no duty to provide optimization reports under the plain
7               language of the State or City contracts

8          The City's claims based on the State of California's RFO are equally meritless.  The RFO

9   required Carrier Defendants to submit "agency reports," including optimization reports, to the

10  "State Contract Administrator to each ATR [Agency Technical Representative] as requested."

11  §§ 7.16 *et seq.*, 7.17.  *See* State of California's Request for Offer DGS-1070, attached to the

12  Cameron Decl. as Ex. C, at pp. 24–25.  Notably, the RFO (and the resulting PA) did not provide

13  for the submission of optimization reports to political subdivisions.  Therefore, the City had no

14  right to optimization reports under the State's contract with AT&T.

15

16         The City's own agreements with AT&T also did not provide for any optimization reports.

17  As alleged in the Complaint, the City claims only that the contracts required AT&T to "routinely

18  identify" users "not in the most optimized plan" and "work with" the City to "place users in the

19  most optimized plan."  Complaint, at ¶ 93.  This provision on its face does not require AT&T to

20  provide *any* reports to the City.   In any event, AT&T provided complete information and

21  reporting through various channels as it stated it would in responding to the various RFPs and

22  RFOs.  *See infra* Section IV(A)(4).

23

24         3.   AT&T had no obligation to provide services at the "lowest available cost"
25         The City's claim that it was entitled to receive serves from AT&T at the lowest cost

26  available is also precluded by the plain wording of the contracts.  Notably, the WSCA

27  agreements do not contain any language requiring AT&T to "ensure" or "guarantee" the "lowest

28  cost available."  The City's complaint references the use of lowest cost available in the

9

1  introductory language to the "General Services" section of the RFPs.  At most, this reference

2  merely establishes that prospective bidders should provide competitive bids reflecting the

3  "lowest cost available."  Other provisions in the "Scope of Work" and "General Services"

4  section similarly describe requirements for submitted bids.  *See* Ex. B to the Cameron Decl. at §

5  3 ("All services proposed by the responding contractors shall meet each specific requirement

6  listed in this section. . . . § 3.1.3 Detail standard features such as voicemail, call waiting, call

7  back . . .").  The instruction to Defendant Carriers to submit the "lowest cost available" they

8  were willing to bid is consistent with other references to costs in the RFPs as well .  *See, e.g.*, *id.*

9  at § 5 ["Cost is a primary criterion for the selection process.  *Proposals will be evaluated* based

10  on the lowest estimated net total cost to WSCA and each individual participating entity . . . ."]

11  [emphasis added].)

12          Accordingly, this bare reference to "lowest cost available" does not somehow transform

13  the meaning of the completely distinct optimization reporting provisions.  The City merely

14  alleges without any basis that the references to "lowest cost available" are "interlock[ed]" to the

15  provisions under the contract specifying that optimization reports are to be provided to the Lead

16  State.  Complaint,  at ¶¶ 59, 70.  But the lowest available and optimization provisions are entirely

17  distinct from each other as they located in different sections of the contracts and do not even

18  cross-reference each other.  The City is unable to point to any definitions or other language in the

19  contract suggesting that AT&T was required to select an "ideal" plan going forward for every

20  wireless subscriber on a quarterly basis.  Furthermore, the notion that AT&T could accurately

21  predict wireless subscriber usage for each billing cycle so that City was charged the "lowest

22  available cost" defies reality.  This interpretation is not tethered to any provision of contract,  is

23  absurd and unreasonable, and therefore must be rejected out of hand. *See Edwards v. Arthur*

24  *Andersen LLP*, 44 Cal. 4th 937, 953-54 (2008) (requiring the Court to "give [a contract] such an

25  interpretation as will make it lawful, operative, definite, reasonable and capable of being carried

26  into effect." [internal quotation marks omitted]); Cal. Civ. Code § 1643.

27          4.      AT&T fully met any reporting requirements as recognized by the
                   Complaint

28

10

1    Even assuming that AT&T owed any reporting obligation to the City under the contracts,

2    it fully satisfied this requirement.  In its responses to both the WSCA RFPs and to the California

3    RFO, AT&T made clear how it would provide information and data as part of any optimization

4    related reporting.  Complaint, at ¶¶ 111, 112, 114 (noting that AT&T would provide information

5    through WIN CDs, its "Premier online site," and "Stewardship report[s].").  AT&T's responses

6    were "expressly incorporated" into the contracts.  *Id.* at ¶¶ 50, 88.  Indeed, in executing its PA,

7    the State and AT&T agreed to give weight to AT&T's Response to RFO over the RFO, WSCA

8    Master Agreement, and WSCA RFP.  *See* WSCA I Participating Addendum between State of

9    California and AT&T, attached to the Cameron Decl. as Ex. D, at § 3(e) (Granting precedence to

10   AT&T's "Response to the Request for Offer (RFO) DGS 1070 together with its exhibits and

11   addendum(s)" over the RFO and WSCA Master Price Agreement).  As the Complaint

12   recognizes, AT&T subsequently followed through on its promises and provided information

13   through the various tools described above.  Complaint, at ¶¶ 102, 106, 112; *see also id.* at ¶¶ 101,

14   104, 106 (acknowledging that AT&T provided "usage reports," "overage reports," and "report[s]

15   used to promote new rate plans or analyze possible changes.").  These admissions confirm that

16   AT&T complied with any contractual reporting obligations due under the contracts and therefore

17   preclude the City's contract-based claims.[5]

18   **B.    The City has failed to adequately plead the elements of a CFCA claim**

19   "Patterned on [the federal False Claims Act]" ("FCA"), the CFCA permits recovery from

20   any person who, "[k]nowingly presents or causes to be presented [to the state or any political

21   subdivision] . . . a false claim for payment or approval."  Cal. Gov't Code § 12651(a)(1); *City of

22   Pomona v. Superior Court*, 89 Cal. App. 4th 793, 801 (2001).[6]  To properly state a CFCA claim,

23

24   [5]Apart from the substantive merits of the City's contractual claims, the City is "precluded from asserting a quasi-contract claim under the theory of unjust enrichment" because its Complaint "plead[s] the existence of an

25   enforceable contract and their unjust enrichment claim [does] not deny the existence or enforceability of that agreement."  *Klein v. Chevron U.S.A., Inc.*, 202 Cal.App.4th 1342, 1389–1390 ( 2012).  Therefore, at a minimum,

26   the City's unjust enrichment claim must be dismissed.

27

28   [6] Because the CFCA is modeled after the FCA, California state courts look to the FCA and related case law for guidance in interpreting the CFCA.  *See, e.g., City of Pomona*, 89 Cal. App. 4th at 802 ("Given the lack of California authority and the very close similarity of [the CFCA] to [the FCA], it is appropriate to turn to federal

1  a plaintiff must plead among other things: (1) an objectively false claim; and (2) scienter.  The

2  City's claims fail on both counts.

3              1.        The City has failed to plead an objectively false claim

4              The City's fraud claims are based entirely on the alleged contractual breaches discussed

5  above.  However, this difference of opinion between the parties over the meaning of the

6  contracts lacks the objective falsity necessary to give rise to fraud.

7              Under the CFCA, City must show a claim that is "actually false."  *See* Cal. Gov't Code §

8  12651(a)(1); *Cafasso,* 637 F.3d 1047 ("[A]n actual false claim is the *sine qua non* of a[n FCA]

9  violation." [alternations in original; internal quotation marks omitted]).  This means that "the

10  statement or conduct alleged must represent an objective falsehood."  *United States ex rel.*

11  *Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).  Importantly, "mere

12  allegations of poor and inefficient management of contractual duties are not actionable . . . [and]

13  imprecise statements or differences in interpretation growing out a disputed legal question are

14  similarly not false . . . ."  *Id.* at 377 (internal quotations and citations omitted).

15              The City's claims are not based on an objective falsehood, but rather represent at most a

16  "disputed legal issue."  *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465 (9th Cir. 1996).  As

17  noted above, the language of the contract required Carrier Defendants to provide optimization

18  reports only to the "Lead State, " not to political subdivisions like the City.  The dispute over that

19  wording hardly gives rise to a fraud claim.  Nor can AT&T be said to have committed fraud by

20  failing to ensure that the City paid the "lowest cost available" at all times when the contracts do

21  not contain any express language making any such "guarantee."

22              The City's claims, at most, relate to a contract dispute that turns on the parties'

23  conflicting interpretations of several clauses dispersed throughout a complex agreement.  The

24  City goes as far as to acknowledge that AT&T provided information and data to it in multiple

25  ways, including through "overage reports," and "report[s] used to promote new rate plans or

26

27

28  cases for guidance in interpreting the act.").

1  analyze possible changes."  The mere fact that the City now disputes the adequacy of that

2  reporting does not somehow turn this run-of-the-mill contract dispute into a fraud claim.  That is

3  particularly true given that the City is unable to point any definitions of the terms optimization or

4  lowest cost available in the contract that unambiguously support their interpretation.  Where

5  there are legitimate grounds for disagreement over the scope of contract, as is the case here, there

6  is simply no basis for a fraud claim.  *See Hagood*, 81 F.3d at 1477 (a "disputed legal issue . . . is

7  not enough to support a reasonable inference that the [statement or claim] was *false* within the

8  meaning of the False Claims Act."); *Wilson*, 525 F.3d at 377-78 (concluding that "false or

9  fraudulent" element of an FCA claim "surely cannot be construed to include "run-of-the-mill

10  contract breach action that is devoid of any objective falsehood") [internal quotation marks

11  omitted]; *United States ex rel. Jamison v. McKesson Corporation*, 784 F.Supp.2d 664, 676 (N.D.

12  Miss. 2011) (a party's "subjective interpretation of Defendants' regulatory [or contractual

13  duties]" is not sufficient to rest a claim on an "objective falsehood, as required by the FCA").

14      Accordingly, the City has failed to meet its pleading obligations, particularly because the

15  Complaint is peppered with allegations suggesting an innocent, alternative explanation—that the

16  parties simply misunderstood their duties.  Because the City has failed to definitely exclude this

17  "innocuous alternative explanation," its claims must fail.  *Eclectic Props. E. v. Marcus &

18  Millichap, Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  And this "garden-variety breach[] of

19  contract" certainly cannot proceed as a fraud case.  *See United Health Services, Inc. v. United

20  States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

21      2.  The City has failed to plead scienter

22      "The scienter requirement is critical to the operation of the False Claims Act, " *United

23  States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998), and requires the City

24  to demonstrate the "'knowing presentation of what is known to be false.'"  *Id.* (citing *Hagood v.

25  Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).  "'Innocent mistakes, mere

26  negligent misrepresentations and differences in interpretations' will not suffice to create

27  liability."  *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011)

28  (citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006)).

13

1   "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent

2   and at least as compelling as any opposing inference or nonfraudulent intent." *Tellabs, Inc. v.*

3   *Makor Issues & Rights*, 551 U.S. 308, 314 (2007).  The City's claims fail to meet this threshold

4   requirement.

5            Nowhere in the Complaint does the City allege with the requisite degree of particularity

6   that AT&T used palpable lies or other intentional misrepresentations when executing any

7   contracts or submitting invoices to the City for payment.  *See Hagood*, 81 F.3d at 1478; *X Corp.*

8   *v. Doe*, 816 F. Supp. 1086, 1093 (E.D. Va. 1993).  Indeed, the City's half-hearted claims that

9   AT&T knowingly made "deceptive half-truths" fall well short of alleging this.  Complaint, at ¶

10  110.  The City merely states that "*if AT&T intended not* to prepare optimization reports each

11  quarter," then its representations would be false.  Complaint, at ¶ 115 (emphasis added).

12  Speculation concerning AT&T's possible state of mind—which is all that City alleges—does not

13  suffice.  *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.

14  1999) (noting that promises of future compliance are knowingly false only if defendant

15  "intended to flout the regulations from the very beginning").  The City also claims AT&T knew

16  what was required under the contracts based on its "dealings with other customers," *see e.g.*

17  Complaint, at ¶ 99, but these conclusory allegations are entirely devoid of any factual support or

18  specificity to satisfy the City's pleading burden.  Moreover, AT&T's unrelated contracts and

19  commercial dealings are irrelevant to its agreements and course of dealings with the City.

20           In any event, the City's own recognition of the extensive efforts that AT&T made in

21  reporting information is flatly inconsistent with any claim of knowing fraud.  Indeed, the City

22  dedicates several pages of its Complaint summarizing all the reports City *did* receive from

23  Carrier Defendants, including AT&T.  *See* Complaint, at ¶¶ 97–107.  As noted above, the

24  contracts did not require optimization reports and services at the lowest available cost in the

25  manner that Plaintiffs now allege, and the various information which AT&T did provide to the

26  City apparently without any objection at the time just confirms the parties' contemporaneous

27  understanding of that fact.  At worst, they establish that AT&T had a different understanding of

28  its contractual obligations.  *See* Complaint, at ¶¶ 111–112, 114 (highlighting AT&T's responses

14

1    for satisfying the optimization provisions).  These allegations lead to the unremarkable

2    conclusion that AT&T understood, based on a reasonable interpretation of the agreements, that

3    any reporting obligations were fully satisfied through customer access to WIN CDs, the Premier

4    portal, Stewardship Reports, and dedicated service representatives to help with any other billing

5    questions.[7]  Indeed, this highlights the fundamental flaw with the City's CFCA claim: the City is

6    attempting to "shoehorn what is, in essence a breach of contract action" into allegations of fraud.

7    *Wilson*, 525 F.3d at 373.

8            In fact, the City's conduct demonstrates that it never believed that AT&T breached any

9    material obligation of the contract, much less that AT&T acted with the requisite level of

10   scienter.  The City paid wireless invoices in full notwithstanding its awareness throughout the

11   duration of the contracts that it was not receiving rate plan optimization reports in the form it

12   now alleges were required.  Indeed, the City would have been reminded of the alleged breach

13   each quarter when AT&T did not submit the requisite rate plan optimization reports to the City.

14   In fact, even after the City retained the services of third-party firm CBC in 2011 to perform rate

15   optimization analyses, the City still continued paying its invoices.  *See* Complaint, at ¶ 140.  The

16   City not only continued paying its bills after becoming aware that it was not receiving the reports

17   it believed it was entitled to under the contract, it renewed its contract with AT&T two years

18   later in 2013.  Complaint, at ¶ 94.  Not surprising given these events, the City's Complaint does

19   not identify any instances where the City notified AT&T of any breach of any optimization

20   reporting requirements or requested some other information or reporting than what was being

21   provided.  The City's conduct throughout the relevant time period—including its failure to object

22   to AT&T's reporting, paying its invoices in full, and renewing its wireless contracts—

23   demonstrates unequivocally that AT&T did not perpetrate a knowing fraud and thus cannot

24   support the City's CFCA claims.

25           The City's remaining allegations are nothing more than conclusory statements about what

26   the Carrier Defendants collectively knew.  *See, e.g.*, Complaint, at ¶ 6.  Repeatedly alleging that

27   _____

28   [7] Moreover, as noted above, AT&T had different reporting obligations that it owed to the Lead State than it owed to
     any political subdivision such as the City.  *See* Ex. E to the Cameron Decl., at p. 9.

1   Carrier Defendants acted "knowingly" does nothing to satisfy the "critical" element of scienter.

2   *See Knudsen I*, 2016 WL 4548924 at \*11 ("These are conclusory assertions insufficient to

3   support [] allegations of knowledge."); *see also Hamilton v. Greenwich Inv'rs XXVI, LLC*, 195

4   Cal. App. 4th 1602, 1615 (2011), *as modified* June 15, 2011 (affirming dismissal because

5   plaintiffs pleaded only "conclusory allegations" and "not facts to show that defendant had

6   fraudulent intent").  *Knudsen I* is instructive.  Judge Breyer found wanting Plaintiffs' assertions

7   that Defendants acted "'knowingly' insofar as they allegedly knew that they violated their

8   disclosure obligations."  *Knudsen I*, 2016 WL 4548924 at \*11.  Like *Knudsen I*, the City

9   advances the same generalized allegations in a manner insufficient to plead scienter.  *See, e.g.*,

10  Complaint, at ¶ 6 ("The Carriers knowingly chose not to make good on their contractual

11  commitments.").

12  ## C.   The City Fails to Allege Fraud with Particularity Under Rule 9(b)

13  The City's fraud claims must be plead with particularity.  To satisfy this burden, City

14  must identify the "who, what, when, where, and how" of the alleged fraud.  *Cafasso*, 637 F.3d at

15  1055.  Additionally, where fraud claims are brought against corporate defendants, plaintiffs face

16  a higher burden.  "The specificity requirement in a 'fraud action against a corporation requires

17  the plaintiff to allege the names of the persons who made the allegedly fraudulent

18  representations, their authority to speak, to whom they spoke, what they said or wrote and when

19  it was said or written.'"  *See Stewart v. Am. Ass'n of Physician Specialists, Inc.*, No. 5:13-CV-

20  1670-ODW, 2015 WL 134061, at \*5 (C.D. Cal. Jan. 8, 2015) (quoting *Tarmann v. State Farm

21  Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 157 (1991).  The City has failed to meet that burden.

22  *First*, the City impermissibly states allegations indiscriminately against the Carrier

23  Defendants as a collective group.  The AT&T-specific allegations can be summarized as follows:

24  (1) AT&T provided responses to the WSCA I and II RFPs [Complaint, at ¶¶ 111–115]; (2) an

25  AT&T authorized representative entered into several agreements vis-à-vis WSCA I and II [*Id.* at

26  ¶¶ 62, 66, 74, 77, 81, 89, 93–94, 130, 131]; and (3) AT&T submitted certain reports to the City

27  [*Id.* at ¶¶ 102, 106] that the City maintains were insufficient to satisfy AT&T's contractual

28  obligations.  The remaining allegations focus either on Sprint and Verizon, or Carrier Defendants

16

1  as an amorphous group who happened to engage in the same fraudulent conduct notwithstanding

2  that they compete vigorously for market share in the telecommunications industry.

3       The City's attempt to plead fraud *en masse* is wholly insufficient as a matter of law.

4  "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires

5  plaintiffs to differentiate their allegations when suing more than one defendant and inform each

6  defendant separately of the allegations surrounding his alleged participation in the fraud." *Lee*,

7  655 F.3d at 997–98 (quotations omitted); *see also Knudsen I*, 2016 WL 4548924 at *6–7

8  (relator's failure to narrow and differentiate between defendants did not satisfy Rule 9(b)).  "A

9  plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent

10  scheme" and each defendant's "role in making a false statement" to the government.  *Id.; see*

11  *also United States ex rel. Lawson v. Aegis Therapies, Inc.*, No. CV 210-72, 2013 WL 5816501,

12  at *3 (S.D. Ga. Oct. 29, 2013).  The City's general allegations against all Defendants do not

13  satisfy that obligation as they do not plead the who, what, when, where, and how.  The City's

14  few AT&T-specific allegations do not fill that sizable  void either.

15       As to the "who," the  City's allegations concerning the AT&T employees who signed the

16  contracts and "key personnel/staff" are woefully insufficient.  Indeed, the City's Complaint fails

17  to identify any individuals who perpetrated the fraudulent conduct or their specific role in the

18  scheme.  For example, the City does not allege that AT&T's signatories knew that provisions of

19  the contract were false, or that anyone at AT&T intended to breach any relevant contractual

20  obligations.  The Complaint also fails to allege who at AT&T submitted "false" invoices or the

21  individuals responsible for providing any rate plan optimization .  "This type of allegation, which

22  identifies a general sort of fraudulent conduct[,] but specifies no particular circumstances of any

23  discrete fraudulent statement, is precisely what Rule 9(b) aims to preclude."  *Cafasso*, 637 F.3d

24  at 1057; *see also In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994)

25  (en banc) (noting that time, place, and content of an alleged misrepresentation, along with an

26  explanation of why the statement is false or misleading, are required to satisfy Rule 9(b)),

27  *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir.

28  2011); *United States v. Fulton Cty., Georgia*, No. 1:14-CV-4071-WSD, 2016 WL 4158392, at *7

1   (N.D. Ga. Aug. 5, 2016) (complaint did not satisfy Rule 9(b) where plaintiff did not identify

2   employees involved in regulatory violations or submission of false certifications).

3           The City similarly fails to adequately allege the "when" and "where" elements related to

4   its fraud claims.  The City's Complaint appears to point to the invoices it received from AT&T

5   as the lynchpin of any alleged fraud.  But in light of the City's longstanding failure to "signal a

6   change in position" even though it had clear knowledge of any purported deficiencies with

7   AT&T rate plan optimization reporting, the City cannot now plausibly assert that those paid

8   invoices constituted the "when" and "where" of AT&T's alleged fraud.  *Escobar*, 136 S. Ct. at

9   2002.

10          Regarding the "what" and "how" of its fraud claims, the City does not allege with the

11  requisite degree of particularity that AT&T fraudulently induced it to sign any contract.  The

12  alleged statements cited in the Complaint only contemplate future performance.  *See, e.g.*,

13  Complaint, at ¶ 111 ("Cingular *will comply* with this requirement").  The City does not assert

14  particularized facts to show that these statements were false when made, or that AT&T, in fact,

15  never intended to comply with any contractual obligation.  Rather, the City merely alleges that

16  Carrier Defendants "were not prepared to analyze rate plan assignments."  *Id.* at ¶ 110.  The City

17  does not provide specific factual allegations regarding how AT&T was unprepared to fulfill its

18  obligations—much less that it did so knowingly—other than to plead that Carrier Defendants as

19  a collective unit failed to gather "resources."  *Id.* at ¶ 109.  That hardly suffices to plead knowing

20  fraud.

21          Finally, the City fails to adequately plead how it was overcharged by AT&T.  The City

22  asserts that "[b]ecause [Carrier Defendants] failed to provide rate plan optimization, [they]

23  regularly submitted invoices for payment to the City . . . that were substantially above the

24  'lowest cost available.'"  Complaint, at ¶ 136.  But the City fails to plead facts explaining what

25  constitutes "rate plan optimization," or how that led to pricing above the "lowest cost available."

26  Its group-wide assertions that Carrier Defendants breached their obligations to provide

27  optimization reports are insufficient to establish that, as a result, the City was not charged the

28  lowest available cost under any of its contracts with AT&T.

DMSLIBRARY01\29872439.V8

1    At the very least, the City's claims of overcharges have no possible merit following the

2    City's retention of CBC in 2011 to perform rate plan optimization.  The City can hardly allege

3    that it incurred overcharges due to any failure by AT&T to perform rate plan optimization for the

4    time period that it was receiving these exact same services from a third party vendor.

5    **V.**    **CONCLUSION**

6    The City's claims are precluded by the plain language of the contracts.  In addition, the

7    City has failed to meet its pleading burden under Rules 8 and 9, nor has it adequately plead the

8    elements of a CFCA claim.  Like the *Knudsen I* Complaint, any attempt to amend the pleading

9    will be futile.  The Court, therefore, should dismiss this case with prejudice.

10

11   DATED:  June 30, 2017                    **KING & SPALDING LLP**

12

13                                           By:  */s/ W. Scott Cameron*
                                                 W. SCOTT CAMERON

14                                               Attorneys for Defendant
                                                 NEW CINGULAR WIRELESS NATIONAL

15                                               ACCOUNTS, LLC D/B/A CINGULAR
                                                 WIRELESS, NOW KNOWN AS AT&T

16                                               MOBILITY NATIONAL
                                                 ACCOUNTS LLC

17

18

19

20

21

22

23

24

25

26

27

28