NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
ERIC J. BUESCHER (SBN 271323)
ebuescher@cpmlegal.com
ADAM M. SHAPIRO (SBN 267429)
ashapiro@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for City of Los Angeles*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES *ex rel.* RICHARD KNUDSEN,<br><br>                Plaintiff,<br><br>        v.<br><br>NEW CINGULAR WIRELESS NATIONAL ACCOUNTS, LLC dba CINGULAR WIRELESS, NOW KNOWN AS AT&T MOBILITY NATIONAL ACCOUNTS LLC; and DOES 21-30,<br><br>                Defendants. | CASE NO. 2:17-cv-00816-TLN-AC<br><br>**CITY OF LOS ANGELES'S OPPOSITION TO NEW CINGULAR WIRELESS NATIONAL ACCOUNTS, LLC's MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>Date:    September 7, 2017<br>Time:    2:00 p.m.<br>Ctrm:    2, 15th Floor<br>Judge:   Hon. Troy L. Nunley |

1

**TABLE OF CONTENTS**

**Page No.**

I.     INTRODUCTION ......................................................................................................... 1

II.    BACKGROUND ........................................................................................................... 1

III.   LEGAL ARGUMENT ................................................................................................... 4

    A.     The Contracts Required AT&T to Provide Optimization Reports ........................ 4

        1.     Principles of Contract Interpretation.....................................................4

        2.     The Plain Language of the WSCA Agreements Show AT&T Was Obligated to Provide the City with Optimization Reports............................................4

        3.     The City's View Is Consistent with the Purpose of Cooperative Purchasing Agreements and WSCA Agreements' Structure........................................5

        4.     City Contracts I and II Confirm the City Is Entitled to Optimization Reports ................................................................................................................6

        5.     AT&T's Interpretation Is Unreasonable and Based on Incomplete Evidence ................................................................................................................7

    B.     AT&T Failed to Fulfill its Obligation to Provide Optimization Reports .............. 9

    C.     The WSCA Contracts Required AT&T to Provide Services at the "Lowest Cost Available" ........................................................................................................ 10

        1.     The Text and Structure of the Contracts Required AT&T to Provide Service at the "Lowest Cost Available"................................................................10

        2.     AT&T's Objections to Plaintiffs' Interpretation Lack Merit....................11

    D.     The City Adequately Plead the Elements of a CFCA Claim .............................. 12

        1.     AT&T's Claims Were Objectively False....................................................12

        2.     The City Adequately Pleaded Scienter .....................................................15

    E.     The City's Fraud Claims Are Pleaded with Particularity ..................................... 16

IV.    CONCLUSION............................................................................................................ 20

**CITY OF LOS ANGELES'S OPPOSITION TO AT&T'S MOTION TO DISMISS**                i

## TABLE OF AUTHORITIES

Page No(s).

**Cases**

*AIU Ins. Co. v. Superior Court,*
   51 Cal. 3d 807 (1990) ............................................................................................. 4

*City of Pomona v. Superior Court,*
   89 Cal.App.4th 793 (2001) ............................................................................... 12, 18

*Feller v. Transamerica Life Ins. Co.,*
   No. 216CV01378CASAJWX, 2016 WL 6602561, at *10 (C.D. Cal. Nov. 8, 2016) .................. 7

*Gaines v. Home Loan Ctr., Inc.,*
   No. SACV08667AHSRNBX, 2010 WL 11506442, at *7 (C.D. Cal. May 24, 2010).................. 4

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.,*
   467 U.S. 51 (1984).............................................................................................. 16

*Klein v. Chevron U.S.A., Inc.,*
   202 Cal.App.4th 1342 (2002) ............................................................................... 10

*Knudsen v. Sprint Commc'ns Co.,*
   2016 WL 4548924 (N.D. Cal. Sep. 1, 2016) .............................................................. 15

*Legacy Vulcan Corp. v. Superior Court,*
   185 Cal. App. 4th 677 (2010) ............................................................................... 11

*Miller v. Glenn Miller Prods., Inc.,*
   454 F.3d 975 (9th Cir. 2006) ................................................................................ 14

*Moyo v. Gomez,*
   32 F. 3d 1382 (9th Cir. 1994) ............................................................................. 9, 16

*S.F. Unified Sch. District ex rel. Contreras,*
   182 Cal. App. 4th 438 (2010) ............................................................................... 19

*State of California ex rel. OnTheGo Wireless, LLC v. Cellco Partnership, et al.,*
   Case No. 34-2012-00127517 ......................................................................... 4, 10, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007).......................................................................................... 15

*U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l,*
   600 F. App'x 969 (6th Cir. 2015) ........................................................................... 19

*U.S. ex rel. Hagood v. Sonoma Cty. Water Agency,*
   929 F.2d 1416 (9th Cir. 1991) .............................................................................. 15

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ................................................... 13

*U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*,
   688 F.3d 410 (8th Cir. 2012) .................................................... 19

*U.S. ex rel. Roby v. Boeing Co.*,
   184 F.R.D. 107 (S.D. Ohio 1998) ............................................... 18

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir.2008) ..................................................... 12

*United States ex rel. Campie v. Gilead Sciences*,
   2017 U.S. App. LEXIS 12163, at *28 (9th Cir. July 7, 2017)................... 13

*United States ex rel. Chilcott v. KBR, Inc.*,
   No. 09-4018, 2013 U.S. Dist. LEXIS 153331, at *22–23 (C.D. Ill. Oct. 24, 2013)................... 15

*United States ex rel. Escobar v. Universal Health Servs.*, Inc.,
   842 F.3d 103 (1st Cir. 2016).................................................... 19

*United States ex rel. Lee v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) ................................................... 15

*United States ex rel. Oliver v. Parsons Co.*,
   195 F.3d 457 (9th Cir.1999) .................................................... 14

*United States v. Corinthian Colls.*
   655 F.3d 984 (9th Cir. 2011) ................................................... 17

*Zucco Partner, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................... 15

**Statutes**
Cal. Civ. Code. § 1636........................................................... 4

Cal. Gov. Code § 12651 .......................................................... 1

F.R.C.P. 9(b) ......................................................... 15, 16, 18, 20

F.R.C.P. 12(d) ................................................................... 7

F.R.C.P. 15(a)(2)............................................................... 20

## I.   **INTRODUCTION**

Plaintiff City of Los Angeles (the "City") entered into contracts with Defendant New Cingular Wireless National Accounts LLC ("AT&T") for wireless services.  As part of these contracts, AT&T agreed to provide the City with rate plan optimization on a quarterly or routine basis, as well as services at the "lowest cost available" for wireless services.  Optimization is the process through which AT&T was to identify the one rate plan among those offered for each wireless customer that would result in the lowest cost to the City.  AT&T flouted these provisions, resulting in millions of dollars in overcharges to the City.  AT&T's motion to dismiss the Complaint should be denied.  Contrary to AT&T's assertions, the contracts at issue required AT&T to provide the City with optimization reports on a quarterly or routine basis, and to provide services at the lowest cost available.  Moreover, the Complaint clearly shows how AT&T failed to provide the optimization reports required by the contracts.  Statements made by AT&T relating to the provision of optimization and optimization reports can be proven objectively false, and thus the City has stated a claim under the California False Claims Act ("CFCA") (Cal. Gov. Code § 12651).  AT&T's arguments concerning scienter are based on inapposite case law and an inapplicable pleading standard.  And AT&T's contentions regarding the specificity of the Complaint largely ignore the City's detailed allegations.

## II.   **BACKGROUND**

From 2007 to the present, the City purchased wireless services from AT&T under two cooperative purchasing agreements.  ((ECF No. 1 (Consolidated Complaint in Intervention ("Complaint")) ¶ 1.)  ¶¶ 3, 44.)  Cooperative purchasing agreements such as these allow multiple government customers to purchase under the same contract terms and conditions.  (*Id.* ¶ 13.)  The contracts at issue included a number of specialized provisions designed to reduce costs.  (*Id.* ¶ 4.)  Two specific cost saving provisions are relevant to this case.  First, the contracts required AT&T to provide rate plan optimization, a process for selecting the most effective means of reducing costs.  (*Id.*)  Rate plan optimization has a clear and widely accepted meaning in the wireless industry, and AT&T regularly provides this service to its large commercial customers.  (*Id.* ¶ 6.)  The optimization provisions in the contracts required AT&T to identify the one rate plan among the many offered for each wireless customer that would result in the lowest cost to the City.  (*Id.* ¶ 4.)

1    This can save 20 to 30 percent on wireless services.  (*Id.* ¶ 1.)  Second, the contracts included an

2    independent provision requiring AT&T to provide service at the "lowest cost available."  (*Id.*)

3            There are two cooperative purchasing agreements containing similar, but not identical,

4    terms which are at issue in this case.  Both were negotiated by the State of Nevada and are referred

5    to as the Western States Contracting Alliance ("WSCA") contracts.  (Compl. ¶ 48.)  The first was

6    in effect from 2006 to 2012 ("WSCA I") and the second went into effect in 2012 ("WSCA II.").

7    (*Id.*)  The WSCA I and WSCA II requests for proposals ("RFPs") and resulting contracts required

8    AT&T to provide a "quarterly optimization report for each wireless service subscriber."  (*Id.* ¶¶

9    60, 71; Declaration of W. Scott Cameron ("Cameron Decl.") Ex. B  at ATT000030 (§ 3.2.2.2);

10   City's Request for Judicial Notice ("Pl.'s RJN") Ex. 1 at 22 (§ 3.3.2.2).)  The contracts also

11   required AT&T to provide quality wireless equipment and services at the lowest cost available.

12   (Cameron Decl. Ex. B at ATT000029 (§ 3.1.1); Pl.'s RFP Ex. 1 at 20 (§ 3.1.2).)  AT&T certified

13   that it read and understood the RFPs and that it agreed to comply with these requirements.

14   (Compl. ¶ 62.)  AT&T did not attempt to modify these requirements.  (*Id.* ¶ 77.)

15           The State of California (the "State") executed Participating Addenda (PA), which allowed

16   state agencies and political subdivisions, including the City, to contract with carriers under the

17   same terms and conditions that WSCA I and WSCA II guaranteed.  (Compl. ¶¶ 80-82, 90.)  AT&T

18   first entered into a PA with the State under WSCA I in or around February 27, 2007.  (*Id.* ¶ 88.)

19   The PA authorized California political subdivisions such as the City to purchase wireless services

20   from AT&T under WSCA I.  (*Id.*)  In 2010, the State issued a "Request for Offer" ("RFO") to

21   various wireless carriers so that California-specific terms could be negotiated for inclusion in the

22   PA.  (*Id.*)  The RFOs required carriers to provide "a quarterly optimization report for each wireless

23   service subscriber."  (Cameron Decl. Ex. C at 24-25 (§ 7.16.2).)

24           Effective March 1, 2007, AT&T entered into an agreement ("City Contract I") expressly

25   adopting the terms of the WSCA I contract, including the requirement that AT&T provide

26   quarterly optimization reports.  (Compl. ¶ 93.)  Specifically, City Contract I states:  "This Contract

27   is awarded as a Cooperative Purchase Arrangement, in accordance with . . . the prices, terms and

28   conditions stated in [WSCA I]."  (Pl's RJN Ex. 2 at 1.)  In addition to the optimization provisions

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

**CITY OF LOS ANGELES'S OPPOSITION TO AT&T'S MOTION TO DISMISS**                    2

of WSCA I, City Contract I also stated that AT&T would "routinely identify those users that are not in the most optimized plan and work with the City . . . to place users in the most optimized plan." (Compl. ¶ 93; Pl.'s RJN Ex. 2 at 2.)

In 2013, AT&T and the City renewed their agreement, effective May 1, 2013 ("City Contract II"). (Compl. ¶ 94.) City Contract II expressly adopted "the prices, terms, and conditions stated in [WSCA II]," along with the terms of the California PA. (*Id.*) As with City Contract I, City Contract II also stated AT&T was required to "routinely identify those users that are not in the most optimized plan" and "work with" City personnel "to place users in the most optimized plan." (*Id.*)

AT&T failed to give the City the benefit of the bargain, as it failed to provide the required quarterly optimization reports, even upon request of the City. (Compl. ¶¶ 97-98.) Instead, AT&T produced infrequent reports related to rate plan selections, which did not provide the same cost saving information found in a true optimization report. (*Id.* ¶¶ 98,100–102, 104, 106-107, 111-115.) AT&T passed off some of these reports as optimization reports, misrepresenting their value. (*Id.* ¶¶ 98, 100-102.) For example, AT&T periodically provided the City with usage reports that conveyed raw data and little else. (*Id.* ¶ 102.) AT&T also provided the City with "overage reports" that recommended more expensive plans for lines that exceed plan allowances, but did not suggest less expensive plans for lines that do no surpass usage limits. (*Id.* ¶¶ 104, 106.) These reports were profit-maximizing device for AT&T, not a savings tool for the City. (*Id.* ¶ 104.)

This case was filed by Relator Richard Knudsen in Los Angeles County Superior Court in September 2013. (ECF No. 1-1.) Along with this case, Knudsen filed two additional cases against Sprint and Verizon. The three cases were consolidated together, and the City filed a consolidated complaint in intervention in September 2016 against all three defendants. The City asserts causes of action for violation of the CFCA, unfair business practices in violation of the Unfair Competition Law, breach of written contract, and unjust enrichment. (Compl. ¶¶ 142-166.) Each defendant removed the cases to the Central District of California. (ECF No.1.) On the City's motion, the case was transferred to this Court. (ECF No. 61.)

AT&T, as well, as Sprint and Verizon, have also been named as defendants in a similar action now pending in Sacramento Superior Court, *State of California ex rel. OnTheGo Wireless, LLC v. Cellco Partnership, et al.*, Case No. 34-2012-00127517 ("*OnTheGo*").  The *OnTheGo* plaintiffs have asserted same claims as the City.  (Pl.'s RJN Ex. 3 ¶¶ 166-190.)  The superior court overruled AT&T's demurrer to the *OnTheGo* Plaintiff's second amended complaint, which raised many of the same arguments AT&T has made here.  (Pl.'s RJN Ex. 4.)

## III.   LEGAL ARGUMENT

### A.   The Contracts Required AT&T to Provide Optimization Reports

The WSCA I and WSCA II agreements required AT&T to provide a "quarterly optimization report for each wireless service subscriber."  (Cameron Decl. Ex. B at ATT000030 (§ 3.2.2.2); Pl.'s RJN Ex. 1 at 22 (§ 3.3.2.2).)  In spite of this requirement, AT&T argues the WSCA agreements' optimization-reporting provisions did not extend to the City, but only to the "lead state" of Nevada.  (AT&T's Motion to Dismiss ("MTD") at 7-9.)  The Sacramento Superior Court rejected the same argument when it overruled AT&T's demurrer in *OnTheGo*.  (Pl.'s RJN Ex. 4 at 14-15.)  This Court should do the same.  The plain language of the WSCA agreements and their purpose and structure support the City's reading.  Moreover, AT&T's contrary interpretation is entirely unreasonable and is based on evidence which AT&T takes out of context.

#### 1.   Principles of Contract Interpretation

Under California law, a contract must be interpreted so as to "give effect to the mutual intention of the parties as it existed at the time of contracting."  Cal. Civ. Code. § 1636.  The parties' intent "is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).  A breach of contract claim should only be dismissed where "the agreement is not susceptible to **any** interpretation that could support plaintiffs' theories of liability."  *Gaines v. Home Loan Ctr., Inc*., No. SACV08667AHSRNBX, 2010 WL 11506442, at *7 (C.D. Cal. May 24, 2010) (emphasis added).

#### 2.   The Plain Language of the WSCA Agreements Show AT&T Was Obligated to Provide the City with Optimization Reports

The WSCA I and II optimization provisions establish the City's entitlement to optimization reports.  The RFPs for WSCA I state that four different reports "shall be submitted for the

respective quarter," including a "[q]uarterly optimization report for each wireless service subscriber." (Cameron Decl. Ex. B at ATT000030 (§ 3.2.2.2).) Likewise, the RFPs for WSCA II required carriers to submit various "usage reports" for each respective quarter, including a "[q]uarterly optimization report for each wireless/broadband service subscriber and orders placed for accessories." (Pl.'s RJN Ex 1 at 22 (§ 3.3.2.2).) The State's RFO for WSCA also provided that "WSCA [wireless providers] must provide a quarterly optimization report for each wireless service subscriber." (Cameron Decl. Ex. C at 24-25 (§ 7.16.2).)

On its face, this language required AT&T to provide political subdivisions, including the City, with optimization reports. Further, the WSCA I and II RFPs broadly define "subscriber" without regard to whether the customer is a state or political subdivision: A "subscriber" is simply a "using entity who contracts to receive and pay for wireless or walkie-talkie services." (Cameron Decl. Ex. B at AT000028; Pl.'s RJN Ex. 1 at 19.) As a purchaser under the WSCA I and II agreements, the City was a "subscriber" to whom AT&T owed quarterly optimization reports.

Moreover, the responses AT&T submitted to the WSCA RFPs demonstrate it understood these reporting obligations extended to all purchasers, not just Nevada. Specifically, AT&T represented it "will provide quarterly optimization reports for each subscriber," and that it would develop a "customized reporting function to provide summary data that may be used by WSCA and the Participating Entities in determining the most appropriate plan." (Compl.¶ 114.)

### 3. The City's View Is Consistent with the Purpose of Cooperative Purchasing Agreements and WSCA Agreements' Structure

The City's interpretation is consistent with the optimization provisions' purpose in the context of cooperative purchasing agreements like WSCA I and II. Cooperative purchasing agreements pool "the collective market power [of] government entities" and offer vendors "instant access to the large and lucrative government market." (Compl. ¶ 17.) Having a single entity develop the contract saves time and money, including the effort required to learn about complicated services and develop specialized terms." (*Id.* ¶ 16.) Nevada negotiated master contracts that required carriers to provide government purchasers quarterly optimization reports. (*Id.* ¶ 48.) Optimization is a common industry practice that saves from 20 to 30 percent on wireless services. (*Id.* ¶¶ 1, 108.) It stands to reason that a cooperative purchasing agreement that

1   includes such a major cost saving provision would extend that benefit to the hundreds (potentially

2   thousands) of government entities that purchase services under it.

3          Bolstering this view, WSCA I and II expressly confer on political subdivisions the same

4   rights that Nevada and other purchasers enjoy.  The Standard Terms and Conditions in the WSCA

5   I RFP, for example, require carriers "to supply the political subdivisions based upon the same

6   terms, conditions and prices" as other purchasers under the agreement.  (Cameron Decl. Ex. B at

7   ATT000072 ("Political Subdivision Participation").)  AT&T points out that several of the terms of

8   the WSCA I RFP are expressly unique to Nevada, such as a requirement that carriers "[n]otify the

9   lead State in writing of any unresolved issues or problems that have been outstanding for more

10  than one billing cycle."  (MTD at 8, citing § 3.9.3).)  But the optimization provisions are not one of

11  these terms, as they do not mention the "lead State."

12         The terms of California's PA also confirm that the right to quarterly optimization reports

13  extends to political subdivisions.  The purpose of a PA is to afford "each party" using WSCA "the

14  protection of [the contracts'] terms and conditions."  (Compl. ¶ 80.)  California's PA, which

15  covered political subdivisions, incorporated the terms of WSCA I.  It did not amend AT&T's

16  obligations to provide quarterly optimization reports to exclude political subdivisions.  (*Id.* ¶ 83.)

17         These contractual provisions complement one another.  Terms that put political

18  subdivisions on equal footing with all other purchasers reinforce the RFPs' provision that requires

19  AT&T to provide quarterly optimization reports for each "subscriber."  These provisions support

20  the City's analysis that the optimization reporting requirement includes political subdivisions.

21              **4.     City Contracts I and II Confirm the City Is Entitled to Optimization
                         Reports**

22

23         In addition to incorporating the terms of the WSCA I and II agreements, City Contracts I

24  and II also contain independent provisions which required AT&T to provide optimization reports.

25  Specifically, both contracts provided that AT&T would "routinely identify those users that are not

26  in the most optimized plan and work with the City . . . to place users in the most optimized plan."

27  (Compl. ¶¶ 93, 94.)  This express requirement that AT&T routinely provide optimization, also

28  mandated that AT&T submit optimization reports.

1    As explained in the Complaint, optimization reports are an integral part of optimization.

2    Optimization is the process for selecting the most cost-effective plan for a wireless device.

3    Identifying the most cost-effect plan is technical, and requires detailed and historical usage data, a

4    complete list of all available rate plans, and a means to match up the usage with the optimal plan.

5    (Compl. ¶ 21.)  "The value of rate plan optimization is in the analysis of [the] usage data and

6    potential plan matchups." (*Id.* ¶ 101.)  Optimization reports are the primary means of providing

7    this analysis.  (*Id.* ¶¶ 97-107.)  Thus, in the absence of routine optimization reports, there was no

8    way for AT&T to fulfill its contractual obligation to "routinely identify" users who were not in the

9    most optimized plan and place those users in the most optimized plan.

### 5.    AT&T's Interpretation Is Unreasonable and Based on Incomplete Evidence

10    To defeat a motion to dismiss concerning disputed contractual terms, the City must show

11

12    only that its interpretation of the contract is reasonable. *See Feller v. Transamerica Life Ins. Co*.,

13    No. 216CV01378CASAJWX, 2016 WL 6602561, at *10 (C.D. Cal. Nov. 8, 2016) (" '[w]hen

14    reviewing whether a plaintiff has properly stated a cause of action for breach of contract, we must

15    determine whether the alleged agreement is "reasonably susceptible" to the meaning ascribed to it

16    in the complaint' ").  The City has done so.  Although it is not the City's legal burden to establish

17    that AT&T's contract construction is in error, the City is nonetheless compelled to explain why it

18    cannot stand.

19    AT&T contends that the optimization reporting requirement is limited to Nevada alone

20    based on a single item of evidence which is attached as Exhibit E to the Cameron Declaration.  As

21    an initial matter, the court may not consider matters outside the pleadings on a motion to dismiss,

22    *see* Fed. R. Civ. Proc. 12(d), and AT&T has not requested or established why the Court should

23    take judicial notice of this exhibit.

24    Even if the Court does consider Exhibit E, the evidence is incomplete at best and

25    misleading at worst.  AT&T contends the exhibit shows that Nevada gave an answer to a question

26    posed during the RFP process (the "Q&A") that amended WSCA I to deprive government

27    customers other than Nevada of the cost savings optimization yields.  (MPA at 8, citing Cameron

28    Decl. Ex. E.)  But the the Q&A did nothing of the sort.

The Q&A at issue, which refers to Section 3.2.2.2 in the WSCA I RFP, consists of the following exchange:

> [Question 48:] Please explain what level of detail is required for the reports referenced in Section 3.2.2.2. Also, should these reports be submitted to the Lead State and/or all the participating WSCA states.
>
> [Answer:] Please refer to Attachment F—Quarterly Reports. Reports should be submitted to the Lead State [Nevada].

Cameron Decl. Ex. E, at 9.

AT&T cannot escape the fact that the question does not focus on, let alone mention, optimization reports. Instead, it refers to the entirety of Section 3.2.2.2, which describes four separate reports, without pinpointing which one the question concerns. Moreover, the Attachment F referenced in the "answer," which AT&T has not provided to the Court, is critically important as it is a sample quarterly "Administrative Report." (*See* Pl.'s RJN, Ex. 5.) The reference in the answer to a Quarterly Administrative Report definitely establishes that the Q&A has nothing to do with optimization reports. [1]

In exchange for negotiating and administering the WSCA agreements for the benefit of hundreds of government entities and wireless carriers, the WSCA RFP provided that carriers pay Nevada a quarterly "Administration Fee" equal to 0.0010 percent of the revenue they received from customers utilizing the WSCA contract. (*See* Cameron Decl. Ex. E at 2-3.) Carriers were required to provide quarterly reports setting out the revenue they received and calculating the fee they owed. (*See* Cameron Decl. Ex. B at AT000029-30 (§ 3.2.1.3).) Attachment F is the form used to report the administrative fee AT&T owed containing cells for "Gross Total Sales," the "WSCA Admin Fee Rate" of 0.0010 percent, and a total "WSCA Admin Fee." In short, AT&T could only use Attachment F to report "[u]sage and purchases under the contract," the first of the four reports described in Section 3.2.2.2. On its face, it could not be used for any other report referenced there, including optimization reports. AT&T's subterfuge should be rejected.

Moreover, AT&T's interpretation of the contracts does not make sense, as it is premised on the idea that Nevada was to receive reports concerning City employees. Optimization reports are a

---

[1] Moreover, AT&T has offered no indication that it actually provided optimization reports to Nevada.

key aspect of the optimization services promised by AT&T.  While these reports are of great use to the City, it is unclear why Nevada would need or want them, or what it could possibly do with information concerning subscribers with which it has no connection.

**B.     AT&T Failed to Fulfill its Obligation to Provide Optimization Reports**

Also meritless is AT&T's contention that it fulfilled its contractual obligation to provide the City with quarterly optimization reports.  (MTD at 10-11.)  The City has specifically alleged that AT&T failed to provide the required optimization reports, and on a motion to dismiss, the Court must take those allegations as true.  *Moyo v. Gomez*, 32 F. 3d 1382, 1384 (9th Cir. 1994).

As alleged, AT&T sporadically prepared reports related to rate plan selections.  (Compl. ¶¶ 98-107.)  However, in violation of the relevant contracts, those reports were not provided on a quarterly or routine basis.  (*Id.* ¶ 98.)  Moreover, the substance of those reports did not comport with the contract's optimization provisions.  (*Id.* ¶¶ 98-107.)  For example, AT&T periodically provided the City with usage reports through "WIN CD," and later through its "Premier" online portal, both of which offered raw data and little else.  (*Id.* ¶ 102.)  Neither program provided information about AT&T rate plans or the software necessary to determine the rate plans for each line.  (*Id.* ¶ 102.)  Likewise, AT&T's "Stewardship Reports" were deficient as they failed to analyze lines of service whose usage was lower than the selected rate plan allowed.  (*Id.* ¶ 106.)

AT&T tries to turn these allegations on their head, arguing that it made clear in its RFP and RFO responses that it would provide information through WIN CD, Premier, and Stewardship Reports, and that the Complaint confirms that it did so.  (MTD at 11.)  Because these responses were incorporated into the contracts, AT&T claims its use of these tools was sufficient to satisfy its contractual obligations.  (*Id.*)  The argument ignores the City's allegation that AT&T failed to provide optimization reports on a quarterly or routine basis.  (*See, e.g.*, Compl. ¶ 98.)  Moreover, the fact that AT&T asserted that certain tools could satisfy the contracts' reporting requirements does not mean that those tools in fact did so.  AT&T is essentially arguing that because it falsely represented that it could comply with the mandatory terms of the contract by using WIN CD, Premier, and Steward Reports, the Court should find there was no breach.  To the contrary, that AT&T misrepresented the functions of WIN CD and Premier supports an inference that AT&T

had no intention of following through on its promise to provide optimization.  In any event, the

issue of whether or not AT&T complied with the contracts' reporting requirements is a factual

matter, which cannot be resolved on a motion to dismiss.[2]

### C.    The WSCA Contracts Required AT&T to Provide Services at the "Lowest Cost Available"

AT&T concedes the WSCA I and II RFPs stated that contractors were to provide quality

wireless equipment and services "at the lost cost available," but nevertheless argues it had no

obligation to do so.  (MTD at 10; Compl. ¶ 59, 70.)  According to AT&T, this language merely

established that prospective bidders were to provide competitive bids reflecting the lowest cost

available.  (MTD at 10.) The Sacramento Superior Court rejected a similar argument when it

overruled AT&T's demurrer in *OnTheGo*.  (Pl.'s RJN Ex. 4 at 15.)  And for good reason.

AT&T's interpretation vitiates terms that are explicitly designated "requirements."  At bottom, the

City's interpretation is reasonable, and AT&T errs in pressing the Court to choose between

competing interpretations in evaluating its motion to dismiss.

### 1.    The Text and Structure of the Contracts Required AT&T to Provide Service at the "Lowest Cost Available"

The WSCA contracts contain provisions requiring Defendants to provide service at the

"lowest cost available." (Compl. ¶¶ 59, 70.)  Labeling it a "specific requirement" that carriers

"shall meet," the WSCA I RFP obligated AT&T to "[p]rovide quality wireless equipment and

services at the lowest cost available in a timely and efficient manner." (*Id.* ¶¶ 58–59.)  Consistent

with common usage, the RFP's use of "shall" indicated a mandatory requirement. (*Id.* ¶ 58.)  And

the WSCA II RFP titles as a "General Requirement[]" a provision that carriers must "[p]rovide

quality wireless voice services, wireless broadband services, equipment and accessories at the

lowest cost available in a timely and efficient manner." (*Id.* ¶ 71.)

---

[2] AT&T also contends that the City's unjust enrichment claim should be dismissed because,
according to AT&T, it is based on a breach of contract.  (MTD at 11, n. 5.)  A plaintiff may not
proceed on an unjust enrichment claim where the subject of that claim is covered by the parties'
express agreements, and thus may not recover for both a breach of contract and unjust enrichment.
*See Klein v. Chevron U.S.A., Inc.*, 202 Cal.App.4th 1342, 1389 (2002).  However, a plaintiff is free
to plead both causes of action in the alternative.  *Id.*  That is precisely what the City did here.

These requirements complement AT&T's obligations to identify the rate plans that would result in the lowest cost in view of usage. (Compl. ¶¶26.)  It is only possible to achieve service at the lowest cost available if rate plan selections have been analyzed and optimum rate plan assignments are identified, which makes sense given that optimization saves from 20 to 30 per on the cost of wireless services. (*See id.* ¶¶ 1, 2 (the "lowest cost available" requirement "obligated the Carriers to ensure that . . . the City received wireless services at the lowest cost available, including by recommending optimized rate plan assignments"); 157 ("The 'lowest cost available' for wireless services require[d] the Carrier Defendants to provide rate plan recommendations for each line of service so the City's departments could be assigned to the optimal rate plan given each line's usage pattern.").  When AT&T submitted invoices knowing rate plan selections had not been optimized, AT&T likewise knew it was not providing service at the lowest cost available. (*See id.* ¶ 134.)

The "interlocking" nature of the "lowest cost available" and optimization reporting provisions gives effect to both terms. (Compl. ¶ 4.)  The Court should interpret this contractual language "in context so as to give effect to each provision, rather than interpret contractual language in isolation." *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 688 (2010).

### 2.  AT&T's Objections to Plaintiffs' Interpretation Lack Merit

AT&T contends the "lowest cost available" obligation is not a contractual requirement.  Confronted with mandatory terminology, AT&T improbably maintains the provisions "merely establishes that prospective bidders should provide competitive bids reflecting the 'lowest cost available.' "  (MTD at 10.)  The trouble is that AT&T's interpretation ignores the plain language of the terms at issue:  Contract drafters do not call provisions "requirements" that "shall" be met, when they seek to create aspirational, unenforceable pieces of advice.  AT&T thus inappropriately asks this Court to read out of the agreements terms that are expressly designated "requirements" that "shall" be observed.

Additionally, AT&T argues that the City's is interpretation is unreasonable because there was no way for AT&T to accurately predict wireless subscriber usage for each billing cycle so that

1   the City was charged the lowest costs available.  (MTD at 10.)  The argument is meritless.  Had

2   AT&T complied with its contractual obligations, AT&T would have had to identify optimal rate

3   plans and "recommend those rate plans to the City or use those rate plans to achieve the lowest

4   cost available when invoicing the City."  (Compl. ¶ 97.)  AT&T can — and, in different contexts,

5   already does — comply with the City's interpretation.  For instance, AT&T routinely provides

6   optimization analyses to large commercial customers.  (*See id*. ¶¶ 6, 25, 99.)  The City's

7   interpretation also does not require AT&T to guarantee the lowest cost available by predicting with

8   certainty how customers will use wireless devices.  Industry standards reasonably recognize the

9   magnitude of savings optimization can achieve, while acknowledging that those savings may not

10  be the absolute maximum possible.  AT&T cannot now complain that it is "absurd and

11  unreasonable" to expect it to furnish to government buyers a cost saving feature it routinely

12  supplies in other contexts and is committed to provide here.

     The City advances an eminently reasonable interpretation of the "lowest cost available"

13  provision in the contracts at issue.  Because AT&T has failed to demonstrate that the City's

14  reading is unreasonable, its motion to dismiss should be denied.

15

16       **D.**     **The City Adequately Plead the Elements of a CFCA Claim**

17       As to the CFCA claim, AT&T argues the City has failed to adequately plead an

18  "objectively false claim" or "scienter."  (MTD at 12-16.)  Neither claim stands up to scrutiny.

19       **1.**     **AT&T's Claims Were Objectively False**

20       The Court should reject AT&T's contention that the City's CFCA claims must be

21  dismissed because the relevant contractual terms are too ambiguous to support a finding of

22  objective falsity.   (*See* MTD at 12-13.)  It is true that allegations of violations "vague,"

23  "imprecise," or "subjective" contractual terms generally do not give rise to objective falsehoods

24  and thus cannot serve as the basis for liability under the CFCA. S*ee U.S. ex rel. Wilson v. Kellogg*

25  *Brown & Root, Inc.*, 525 F.3d 370, 376–377 (4th Cir.2008).[3]  However, the false statements

26  alleged here are objectively false, and the contractual terms that were violated are in no way vague,

27  imprecise, or subjective.

28

---

     [3] Courts turn to federal cases for guidance in interpreting the CFCA.  *City of Pomona v. Superior Court*, 89 Cal.App.4th 793, 801–802 (2001).

1    As an initial matter, the City alleges more than a breach of contract claim.  The allegations

2    of the Complaint show that AT&T submitted false claims by:  (1) certifying in each claim for

3    payment that it was in compliance with provisions concerning optimization, optimization

4    reporting, and providing services at the lowest cost available, when AT&T knew it was not in fact

5    in compliance; and (2) fraudulently inducing the City to enter into the relevant agreements by

6    representing that it could provide optimization services and services at the lowest cost available

7    when it had no intention or ability to do so.  (Compl. ¶¶ 110, 135-136, 144, 149.)

8    AT&T's arguments have no bearing on the City's fraudulent inducement theory of liability.

9    "This theory, rather than specifically requiring a false statement of compliance with government

10   regulations [or contractual provisions], is somewhat broader.  It holds that liability will attach to

11   each claim submitted to the government under a contract, when the contract or extension of

12   government benefit was originally obtained through false statements or fraudulent conduct."  *U.S.*

13   *ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006); *see also United States ex*

14   *rel. Campie v. Gilead Sciences*, 2017 U.S. App. LEXIS 12163, at *28 (9th Cir. July 7, 2017).  As

15   alleged in the Complaint, AT&T had no intention of complying with the optimization provisions

16   contracts when it agreed to them.  (Compl. ¶ 110.)   AT&T's arguments also have no bearing on

17   the City's "low cost" allegations, as AT&T does not dispute that the contracts' "lowest cost

18   available" provisions are sufficiently precise to support an FCA claim.

19   Moreover, contrary to AT&T's contentions, its certifications regarding optimization are

20   objectively false.  The contracts' requirement that AT&T provide optimization reports on a

21   quarterly or routine basis is not vague, and AT&T's compliance with this term can be objectively

22   assessed — AT&T either provided the required reports or it didn't.  Moreover, as shown in Section

23   IV.A *supra*, there is only one reasonable interpretation of the contracts reporting provisions.  For

24   example, the WSCA agreements, the terms of which are incorporated into City Contracts,

25   expressly require AT&T to provide a quarterly optimization report for each wireless service

26   subscriber.  (Compl. ¶¶ 60, 71; Cameron Decl. Ex. B  at ATT000030 (§ 3.2.2.2); Pl.'s RJN Ex. 1

27   at 22 (§ 3.3.2.2).)  To the extent there is any ambiguity in the plain language of the relevant

28   contracts — there is not — the Court may consider extrinsic evidence to determine the parties'

1  intent.  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006).  It is premature at

2  this stage to consider such extrinsic evidence, let alone determine whether it gives rise to a

3  disputed legal issue.

4       The contracts were also clear about the contents of these optimization reports.  For

5  example, the RFO issued in connection with the WSCA agreements described what carriers should

6  include in their reports:

7
     WSCA [wireless providers] must provide a quarterly optimization report for each
8       wireless service subscriber. The goal of this optimization reports to [sic] ensure that
     each subscriber is utilizing the most appropriate plan. This includes identifying
9       subscribers that may be consistently incurring coverage [sic] charges and therefore
     should move to a higher plan or subscribers consistently under-utilizing a plan and
10       therefore should move to a lower plan.

11  (Compl. ¶ 86, Cameron Decl. Ex C at 24-25 (§ 7.16.2).)  There is no legitimate grounds for dispute

12  about whether the reports AT&T provided satisfied these requirements.  As alleged in the

13  Complaint, "true rate plan optimization analyses were not to be found" in these reports.  (Compl. ¶

14  100; *see also id.* ¶ 101-107.)  AT&T is once again asking the Court to resolve factual matters at the

15  pleading stage by definitively determining that AT&T's reports were close enough to those

16  required by the contracts to preclude a finding of liability under the CFCA.

17       AT&T argues that differences of interpretation cannot give rise to liability, and that an

18  ambiguous contract can never give rise to a false claims action.  (MTD at 13.)  However, whether

19  the contract interpretation AT&T now proffers is reasonable does not resolve whether it knowingly

20  submitted false claims:  That a defendant in litigation can come up with an alternative

21  interpretation of a contract or regulation does not preclude a finding that a false claim was

22  knowingly or recklessly submitted, because to do so ignores a defendant's intent.  If AT&T's

23  argument were correct, it "could submit a claim, knowing it was false, or at least with reckless

24  disregard of its falsity, thus meeting the intent element, but nevertheless avoid liability by

25  successfully arguing that its claim reflected a 'reasonable interpretation' of the requirement and

26  was therefore 'not false.' "  *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 n.3 (9th

27  Cir.1999).

28

1    Regardless, whether AT&T understood the contract in the way that the City alleges is not a

2    matter for a motion to dismiss.  The Complaint alleges how AT&T understood the requirement,

3    based on the specific words AT&T used and its actions in other contexts; those allegations must be

4    taken as true.  If AT&T wishes to show it actually had a different understanding, it is free to do so

5    at the appropriate time—following discovery.  *See U.S. ex rel. Hagood v. Sonoma Cty. Water*

6    *Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (defendant's "comforting conclusion" that it could

7    not have known it made a false statement because of its differing interpretation of the underlying

8    contract "cannot be reached by mere inspection of [relator's] complaint"); *United States ex rel.*

9    *Chilcott v. KBR, Inc.*, No. 09-4018, 2013 U.S. Dist. LEXIS 153331, at *22–23 (C.D. Ill. Oct. 24,

10   2013) (refusing to "make a final decision" as to either contractual interpretation or defendant's

11   intent on a motion to dismiss because "[t]he Court's only role at this stage is to determine whether

12   Plaintiff's allegations, taken as true, are sufficient to raise a claim under the FCA").

### 2. The City Adequately Pleaded Scienter

14   AT&T's arguments regarding scienter may be easily dismissed as they are based on

15   inapposite authority and a faulty interpretation of the Complaint.  AT&T raised similar arguments

16   in its demurrer in *OnTheGo*, which were rejected by the Superior Court.  (Pl.'s RJN Ex. 4 at 20.)

17   Under Rule 9(b), "malice, intent, knowledge, and other conditions of a person[']s mind,

18   including scienter, can be alleged generally." *United States ex rel. Lee v. Corinthian Colls.*, 655

19   F.3d 984, 996 (9th Cir. 2011).  AT&T ignores this principle and insists that the City must meet the

20   heightened pleading standard set forth in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

21   308 (2007).  (MTD at 14 (arguing "[a]n inference of scienter must be more than merely plausible

22   or reasonable — it must be cogent and at least as compelling as any opposing inference or

23   nonfraudulent intent").)  But *Tellabs* only applies to securities cases governed by the Private

24   Securities Litigation Reform Act (PSLRA), which requires a plaintiff to plead "with particularity

25   facts giving rise to a strong inference that the defendant acted with the required state of mind."

26   (*Tellabs* at 321-322.)  As this is not a securities fraud case, the heightened pleading standards

27   established by the PSLRA and *Tellabs* have no application here.[4]  *See Zucco Partner, LLC v.*

28

---

[4] AT&T's reliance on *Knudsen v. Sprint Commc'ns Co.*, 2016 WL 4548924 (N.D. Cal. Sep. 1, 2016), is misplaced since that case also applied *Tellabs*' heightened (and inapplicable) pleading standard.  (*Id.* at 11.)

1    *Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (explaining that PSLRA significantly

2    altered the pleading requirements in securities fraud cases).

3         The City has also alleged facts showing that AT&T knew what the contracts required, as

4    optimization is a common and well understood term in the wireless industry.  (Compl. ¶ 134-135.)

5    Indeed, AT&T regularly complied with contractual optimization provisions for their corporate

6    clients.  (*Id.* ¶ 6, 25, 99, 134.)  AT&T also knew that if it had any questions about the scope of the

7    requirement in the RFPs, it had to seek clarification.  (*Id.* ¶¶ 57, 72, 132.)  Yet it proceeded

8    anyway, without seeking clarification.  (*Id.*)  This was no mere oversight.  (*Id.* ¶ 132-135.)

9         AT&T argues the City did not object to AT&T's failure to provide optimization or

10    optimization reports, and that this precludes a finding of scienter.  (MTD at 14-15.)  But what the

11    City did or did not do to raise these issues is a factual matter which cannot be resolved now.

12    Drawing all inferences in Plaintiff's favor, as the Court must, it is reasonable to infer the City was

13    unaware of AT&T's misconduct because the deficient reports AT&T did provide made it appear

14    AT&T was complying with its contractual obligations.  In any event, the City was entitled to rely

15    on AT&T to provide reports and to place City users in the most optimized plan.  It is now well

16    accepted that "[m]en must turn square corners when they deal with the Government."  *Heckler v.*

17    *Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984) (internal quotations omitted.)

18    "Protection of the public fisc requires that those who seek public funds act with scrupulous regard

19    for the requirements of law."  *Id.*  The Complaint shows that AT&T fell far short of this standard.

20      **E.**     **The City's Fraud Claims Are Pleaded with Particularity**

21         AT&T's contention that the complaint does not meet Rule 9(b)'s pleading standards does

22    not hold water.  The 166-paragraph Complaint specifically alleges AT&T's false statements, the

23    particular individuals who made them, when they were made, and why they were false.  (*See, e.g.*,

24    111-115, 130-131.)  AT&T entirely disregards these detailed factual allegations, as well as the

25    requirement that the Court draw all inferences in the light most favorable to the plaintiff on a

26    motion to dismiss.  *See Moyo*, 32 F. 3d at 1384.  Each of AT&T's arguments is addressed below.

27         **First**, AT&T contends the Complaint impermissibly lumps it together with the other two

28    defendants, Sprint and Verizon.  (MTD at 16-17.)  The argument rings hollow.  The City's

allegations concerning AT&T's misconduct are straightforward:  AT&T failed to comply with its express contractual obligations by failing to provide rate plan optimization and wireless services at the lowest cost available while falsely representing that it had in fact done so.  There is no ambiguity about AT&T's role in the fraud, as there is no allegation that it acted in concert with anyone else.

The City also alleges that each of the other two defendants engaged in an almost identical scheme, but they did so independent of AT&T.  AT&T essentially argues that because the City sometimes alleges that all three defendants acted in the same way, without singling out each defendant by name, the Complaint lacks the requisite particularity.  However, the fact that the City sometimes refers to AT&T, Sprint, and Verizon collectively when describing actions that all three took in no way undermines the specificity of the pleading.  Amending the Complaint to add identical allegations for each defendant might address AT&T's complaints, but it serves no practical purpose other than to make the pleading longer.

In any event, the Complaint does differentiate between the defendants.  As an initial matter, the Complaint describes the cooperative purchasing agreements executed by AT&T, the agreements AT&T entered into directly with the City, the representations AT&T employees made when AT&T entered into these agreements, and why these representations were false.  (Compl. ¶¶ 62, 66, 77, 89, 93-94, 111-115, 130-131.)  The Complaint also describes how AT&T in particular failed to provide rate plan optimization.  (Compl. ¶¶ 97-107, 111-115.)  For example, the City alleges that AT&T touted a number of specific tools that were incapable of producing the required optimization reports.  (Compl. ¶ 111-113.)

Moreover, AT&T's authority on this point is inapposite as it relates to circumstances where a plaintiff alleges that multiple officers or employees of a corporation participated or conspired together in a single fraudulent scheme, but the plaintiff fails to identify the role of each individual defendant in that scheme.  (MTD at 12 (citing *United States v. Corinthian Colls.* 655 F.3d 984, 997-998 (9th Cir. 2011)).)  In contrast, here, the City alleges that each of the defendants perpetrated its own independent fraud.  (Compl. ¶¶ 1, 5, 6.)  Unlike *Corinthian*, this is not a case where several individuals are alleged to have worked or conspired together to commit fraud, and

1  thus there is no need to "identify the role of each defendant in the alleged fraudulent scheme." *See*

2  *Corinthian*, 655 F.3d at 998 (internal quotations and citations omitted).

3  **Second**, the Court should reject the assertion that the Complaint does not identify who at

4  AT&T perpetrated the fraud.   The Complaint describes the AT&T representatives who signed the

5  relevant contracts that AT&T had no intention of satisfying.  (Compl. ¶¶ 62, 66, 77, 89, 93-94.)

6  AT&T complains that the City does allege who at AT&T was responsible for submitting the false

7  invoices or providing rate plan optimization.  (MTD at 17.)  But this is simply not true.  The

8  Complaint identifies by name and title the AT&T contract managers and over a dozen other "key

9  personnel" who were responsible for the contracts and services provided to the City.  (*Id.* ¶ 130-

10 131.)  Indeed, it is unclear what more the City could allege as to "who" was involved in the fraud.

11 The City's allegations amply satisfy the particularity requirements of Rule 9(b), which does not

12 even require a plaintiff to identify with specificity the architects of a fraud.  *See U.S. ex rel. Roby*

13 *v. Boeing Co.,* 184 F.R.D. 107, 111 (S.D. Ohio 1998).

14 **Third,** AT&T argues that the City fails to allege the "when" and the "where" of its fraud

15 claims.  (MTD at 18.)  AT&T asserts that the submission of invoices to the City are the "lynchpin"

16 of any alleged fraud, but does not argue the City fails to plead the particulars of those invoices.

17 (*Id.*)  Instead, it argues that those invoices cannot constitute the "when" and the "where" because

18 the City was purportedly aware of the fraud.  (*Id.*)  AT&T appears to be arguing not that the

19 Complaint satisfies Rule 9(b), but that it has failed to plead materiality.  To the extent the Court is

20 inclined to consider this veiled materiality argument, it should be rejected.

21 Materiality is a "mixed question of law and fact, [and] depends on 'whether the false

22 statement has a natural tendency to influence government action or is capable of influencing

23 government action.' "  *City of Pomona*, 89 Cal. App. 4th at 802.  Here, the Complaint alleges that

24 Defendants' statements in their RFP responses actually influenced the government's decision

25 making.  (Compl. ¶ 123.)  "If the City had known that the Carrier Defendants would not or could

26 not comply with the mandatory or material terms of the contracts, the Carrier Defendants would

27 not have been awarded the contracts on the terms set forth therein."  (*Id.*)  Each applicable RFP

28 also emphasized the importance of the optimization and lowest cost provisions.  Moreover, the

1   WSCA I RFP identified "reasonableness of cost" as its first evaluation criteria, and specified the

2   optimization reporting requirement as "mandatory." (*Id.* ¶¶ 52, 60). The WSCA II RFP and

3   California RFO similarly designated the optimization provision as mandatory. (*Id.* ¶¶ 70, 85–86.)

4       Moreover, regular rate plan optimization reduces wireless costs by 20 to 30 percent.

5   (Compl. ¶ 1.) Savings of such a magnitude can be presumed to be material. In addition, the

6   applicable contracts required AT&T to deliver wireless services at the "lowest cost available," a

7   standard that can only be met with regular rate plan optimization. (*Id.* ¶ 4.) *See S.F. Unified Sch.*

8   *District ex rel. Contreras*, 182 Cal. App. 4th 438, 455–56 (2010) (materiality of breached contract

9   terms supported by other provisions of contract).

10      Allegations that the City hired CBC, a third party consultant, to provide the optimization

11  services that AT&T failed to deliver, or devoted substantial resources to attempt to perform

12  optimization themselves, further support the City's contentions that the breached contract

13  provisions were material. (Compl. ¶ 140.) If optimization was not material, then the City would

14  not have sought these services elsewhere. Walking straight through the looking glass, AT&T

15  asserts that the City is somehow barred from recovering for any overcharges incurred after it

16  retained CBC in 2011. (AOB at 19.) That the City hired a consultant to perform the services that

17  AT&T failed to provide does not immunize AT&T from liability for failing to honor its contract.

18      AT&T's materiality arguments are based on the presumption the City had actual

19  knowledge of the fraud and paid AT&T's invoices anyway. But taking all well-pleaded factual

20  allegations as true, such an inference is unwarranted. Moreover, "mere awareness of allegations

21  concerning [a defendant's misconduct] is different from knowledge of actual [misconduct]."

22  *United States ex rel. Escobar v. Universal Health Servs.*, Inc., 842 F.3d 103, 112 (1st Cir. 2016).

23  And as a matter of law, the City's decision to continue to paying AT&T's claims does not preclude

24  a finding of materiality. *See U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*,

25  600 F. App'x 969, 977 (6th Cir. 2015). Terminating payments typically is just one among several

26  remedies available to a government entity, and courts accord the government broad discretion "to

27  choose among a variety of remedies . . . to combat fraud." *U.S. ex rel. Onnen v. Sioux Falls Indep.*

28  *Sch. Dist.*, 688 F.3d 410, 414-15 (8th Cir. 2012). Ultimately the City's knowledge of the fraud and

what it chose to do about it are matters outside of the pleading which cannot be resolved now.

**Fourth,** AT&T's argument that the City has failed to allege how AT&T fraudulently induced it to sign a contract should be rejected.  (MTD at 18.)   The Complaint includes particularized facts showing that AT&T's representations at the time of contract formation were false when made.  For example, the City alleges that the tools touted by AT&T were incapable of providing optimization.  (Compl. ¶¶ 102, 106, 112-113.)  The City also alleged that AT&T lacked the resources to prepare rate plan optimization, including personnel with necessary expertise, required software and data systems, and the funds required to pay for the efforts.  (Compl. ¶ 109a.)  Contrary to AT&T's contentions, these allegations are specific enough to satisfy Rule 9(b).

**Fifth**, AT&T asserts that the City fails to adequately plead how the City was overcharged by AT&T.  (MTD at 18.)  The argument falls flat.  The City alleges that AT&T's failed to provide optimization services worth tens of millions of dollars and which would have saved the City 20 to 30 percent on its wireless expenditures.  (Compl. ¶ 1, 7.)  The Complaint also explains what constitutes rate plan optimization and how AT&T's failure to provide this service led to pricing well above the lowest cost available.  (*See*, *e.g.*, id. ¶¶ 4, 60, 71.)

## IV.   CONCLUSION

For the foregoing reasons, AT&T's motion to dismiss should be denied.  Should the Court grant the motion to dismiss, the City should be granted leave to amend.  Fed. R. Civ. P. 15(a)(2).

Respectfully submitted,

Dated: August 11, 2017     **COTCHETT, PITRE & McCARTHY LLP**

By:  ___*/s/ Adam M. Shapiro*___
     ADAM M. SHAPIRO
     NIALL P. McCARTHY
     ERIC J. BUESCHER

*Attorneys for Plaintiff City of Los Angeles*