1   W. SCOTT CAMERON (Bar No. 229828)
      *scameron@kslaw.com*
2   **KING & SPALDING LLP**
3   621 Capitol Mall, Suite 1500
    Sacramento, CA 95814
4   Telephone:  +1 916 321 4800
    Facsimile:  +1 916 321 4900
5

6   JOHN C. RICHTER (*pro hac vice*)
      *jrichter@kslaw.com*
7   **KING & SPALDING LLP**
    1700 Pennsylvania Ave., NW
8   Washington, D.C. 20006
    Telephone:  +1 202 737 0500
9   Facsimile:  +1 202 626 3737

10
    Attorneys for Defendant
11  NEW CINGULAR WIRELESS NATIONAL
    ACCOUNTS, LLC D/B/A CINGULAR WIRELESS,
12  NOW KNOWN AS AT&T MOBILITY NATIONAL
    ACCOUNTS LLC
13

14

15              **IN THE UNITED STATES DISTRICT COURT**

16      **EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION**

17
    CITY OF LOS ANGELES EX REL.              CASE NO. 2:17-CV-00816-TLN
18  RICHARD KNUDSEN,
                                             **REPLY IN SUPPORT OF DEFENDANT'S**
19          Plaintiff,                       **MOTION TO DISMISS COMPLAINT**
                                             **PURSUANT TO FEDERAL RULES OF**
20  v.                                       **CIVIL PROCEDURE 12(B)(6) AND 9(B)**

21  NEW CINGULAR WIRELESS NATIONAL           Date:       September 7, 2017
22  ACCOUNTS, LLC D/B/A CINGULAR             Time:       2:00 p.m.
    WIRELESS, NOW KNOWN AS AT&T              Judge:      Hon. Troy L. Nunley
23  MOBILITY NATIONAL ACCOUNTS LLC;          Courtroom:  2
    AND DOES 21 TO 30
24
               Defendants.
25

26

27

28

# TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION .................................................................................................1

II.     UNDISPUTED FACTS .........................................................................................2

III.    ARGUMENT ........................................................................................................3

        A.      The Contracts Did Not Require AT&T to Submit Reports to the City or to
                Provide Services at the Lowest Cost Available .......................................3

        B.      The Complaint Itself Contradicts the City's Assertion That Its CFCA
                Claims Were Adequately Pled ...................................................................5

                1.      The City's Preemptive Arguments About Materiality Fail........................6

        C.      The City Continues to Fall Short of Pleading the Who, What, When,
                Where, and How of a False Claim with the Particularity Required Under
                Rule 9(B)...................................................................................................7

        D.      The City's Last-Ditch Request for Leave to Amend Should Be Denied .................9

IV.     CONCLUSION....................................................................................................10

i

DMSLIBRARY01\31009282.v1

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*City of Pomona v. Superior Court*,
   89 Cal. App. 4th 793 (2001) .................................................................5

5

*San Francisco Unified School Dist. ex rel. Contreras v. First Student*,
   224 Cal. App. 4th 627 (2014) ...............................................................6

6

7

*D'Agostino v. EV3, Inc.*,
   845 F.3d 1 (1st Cir. 2016) .....................................................................6

8

*Ebeid ex rel. United States v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ................................................................6

9

10

*Knudsen v. Sprint Commc'ns Co.*,
   2016 WL 4548924 (N.D. Cal. Sep. 1, 2016) .......................................6

11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..............................................................................6

12

13

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ..........................................................2, 7

14

15

*United States ex rel. Campie v. Gilead Sciences*,
   862 F.3d 890 (9th Cir. 2017) ................................................................7

16

*United States ex rel. Kolchinsky v. Moody's Corp.*,
   2017 WL 825478 (S.D.N.Y. 2017) ......................................................6

17

18

*United States ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) ..............................................................6

19

*United States ex rel. Lee v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) ................................................................8

20

21

*United States of America ex rel. Steven Mateski v. Raytheon Company*,
   2017 WL 3326452 (C.D. Cal. August 3, 2017) ...................................7

22

23

*United States v. Fulton Cty., Georgia*,
   No. 1:14-CV-4071-WSD, 2016 WL 4158392 (N.D. Ga. Aug. 5, 2016) .................8

24

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) .......................................................................6, 7

25

26

**Statutes**

27

Cal. Gov't Code § 12651(a)(1) ..................................................................5

28

California False Claims Act ........................................................1, 2, 5, 6, 10

DMSLIBRARY01\31009282.v1

Federal False Claims Act ..................................................................................................5

**Other Authorities**

Federal Rule of Civil Procedure 8 .............................................................................10

Federal Rule of Civil Procedure 9 ................................................................2, 7, 8, 10

## I.   INTRODUCTION

This case was originally brought by Relator Richard Knudsen, who brought a similar false claims action on behalf of the United States that was dismissed for failure to state a claim. *See* Ex. A to the Declaration of W. Scott Cameron in support of AT&T's Motion to Dismiss ("Cameron Decl."). To avoid a similar fate, the City of Los Angeles, which intervened in this case, tries to rewrite the contracts and revisit the facts of a years-long business relationship. But because the contracts did not say what the City now claims they do, the City's Complaint should be dismissed.

First, notwithstanding the City's arguments, the contracts between the City and AT&T did not obligate AT&T to provide the City with either rate plan optimization reports or wireless services at the "lowest cost available." With respect to the "optimization reports," the City asserts that the term has some commonly understood meaning in the industry, but cites no contractual language (or any other authority) to explain that meaning. Opposition, at 1:26–27. Instead, it acknowledges that AT&T provided WIN CDs, Premiere Portal access, and Stewardship Reports. *Id.* at 9:9–17. It also acknowledges that those reports were "related to rate plan selection," "usage reports," and "overage reports" which identified "lines that exceed plan allowances," but contends that they were not optimization reports. *Id.*; *id.* at 3:15–18. As the City also acknowledges, those reports were to be provided to the "Lead State," not the City. *Id.* at 8:1–7. Nor was AT&T obligated to perpetually revisit the terms of the contract to provide wireless services at the "lowest cost available" rather than as part of the competitive bidding process. Under the contracts, AT&T couldn't unilaterally change those plans. And the City cannot (and does not) suggest that the WSCA drafters intended that AT&T renegotiate with signatories over each agreement every time usage changed slightly. Instead, the City tries to downplay what it cannot ignore outright, by assuring the Court that its interpretation of the agreements is "reasonable." It is not.

Second, the City's California False Claims Act ("CFCA") claims were not adequately pled. The City does not (and cannot) allege that it ever told AT&T that its reports were not enough to satisfy the contract. To the contrary, the City admits that AT&T provided reports

1

about rate plan selection and overages that the City never told AT&T that these reports were
allegedly inadequate, and that despite these purported omissions, the City renewed its agreement
with AT&T.  Nevertheless, the City continues to assert that AT&T was contractually obligated to
provide rate optimization reports and wireless services at the lowest available cost, that AT&T
breached its contract—before and after the renewal—by failing to live up to its obligations, and
that that breach rises to the level of "objective falsity" needed under the CFCA.  But in light of
the City's own admissions, those allegations do not satisfy the CFCA's requirement that the City
plead an objectively false claim made with the requisite scienter.

Third, the City's fraud claims are not pled with the level of particularity required under
Rule 9(b) because its own admissions undercut those claims at every turn.  The City has to
address the requisite "who, what, when, where, and how" of the alleged fraud with adequate
particularity.  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055
(9th Cir. 2011).  It has not done so.  Accordingly, the Court should dismiss this case without
leave to amend.

## II. UNDISPUTED FACTS

- AT&T and the City entered into a Cooperative Purchase Agreement under the WSCA I contract in March 2007.  Opposition, at 1:19–20.
- WSCA I, which was negotiated with the State of Nevada, referred to, but did not define, optimization reports.  *Id*. at 1:26–27.
- WSCA I's references to optimization reports, and to "lowest cost available" services were contained in independent provisions.  *Id*. at 2:1–2.
- Amendment No. 1 to the WSCA I RFP stated that "[r]eports should be submitted to the Lead State."  *Id*. at 8:1–7.
- Over the course of the parties' relationship, AT&T did what it said it would in its response to the RFP, providing the City with reports related to rate plan selection and overage reports identifying lines which exceeded plan allowances through WIN CDs, Premier Portal, and Stewardship Reports.  *Id*. at 3:11–18.; *id*. at 9:12–14, 16–20.
- The City never told AT&T that it believed that AT&T was in breach of its contractual

obligations.  *Id.* at 3:10–11 (citing ¶¶ 97–98 of the Complaint as support for the assertion that the City asked for such information although neither Paragraph addresses notice).

- The City never told AT&T that the reports it was submitting were allegedly deficient, let alone why they were purportedly deficient.  *Id.*

- The City never requested different reporting.  *Id.*

- The City renewed its agreement with AT&T under the WSCA II contract in or around May 2013.  *Id.* at 3:4–5.

## III.   ARGUMENT

### A.   The Contracts Did Not Require AT&T to Submit Reports to the City or to Provide Services at the Lowest Cost Available

In its Opposition, the City tries to connect the dots to support its claim that AT&T had to provide quarterly optimization reports and wireless services at the lowest cost available.  It cannot because the plain language of the contracts demonstrates that no such obligations existed.

First, AT&T had no duty to provide optimization reports to the City under either WSCA agreement, and thus the City's Cooperative Purchase Agreements.  In fact, the City cannot even explain what reports it was entitled to but did not get.  Instead, the City asserts—without any citation—that "rate plan optimization" possesses some widely-accepted meaning (although it never defines that meaning itself).  Opposition, at 1:26 ("Rate plan optimization has a clear and widely accepted meaning in the wireless industry …").  Certainly, the City points to nothing in the contracts that defines the term as between the City and AT&T.  Instead, the City tries to claim that AT&T knew what its obligations were under *this* contract because of its contracts with other entities.  *Id.* at 1:6–7 ("… AT&T regularly provides this service to its large commercial customers.")  But the City never explains why this is so.

Moreover, the City acknowledges that Amendment No. 1 to WSCA I RFP stated that "[r]eports should be submitted to the Lead State [Nevada]."  Opposition, at 8:1–7; *see also* Ex. E to the Cameron Decl. in support of AT&T's Motion.  It doesn't, however, state that they should be submitted to the City.  *Id.*  The City attempts to sidestep this unequivocal language in two ways.  First, the City says the statement does not refer to optimization reports individually, but to

3

all four of the reports identified in Section 3.2.2.2 as a group – a group that nonetheless includes "[q]uarterly optimization reports." *Id*. at 8:8–10; *see also* Complaint, at ¶ 60. But the fact that the Amendment does not refer to one specific report reinforces AT&T's argument – *each* of the four reports identified in Section 3.2.2.2 was to be "submitted to the Lead State." Second, the City points to "Attachment F," which reflects a blank "Administrative Report," to argue that only Administrative Reports were to be submitted to the Lead State. Opposition, at 8:10–14. Section 3.2.2.2 does not identify an "Administrative Report," however, so those reports could not have been the subject of the Amendment's explanation of Section 3.2.2.2. *See* Complaint, at ¶ 60. Rather, the Amendment references Attachment F as an example of the *form* of Section 3.2.2.2 reports, not the *substance*. (Indeed, Section 3.2.2.1 of WSCA I states "Reporting shall be provided in electronic format via e-mail or CD in Excel, with hardcopies available upon request at no extra charge. See Attachment F 'Quarterly Report Format.'") Neither Section 3.2.2.1 or 3.2.2.2 refer to Administrative Reports at all, except as a sample template.

Second, the plain language of the contract also does not support the City's argument that AT&T was obligated to provide wireless services at the "lowest cost available." In fact, the City recognizes that the "lowest cost" reference is independent from the reporting provision. *See* Opposition, at 2:1–2. That concession guts its argument that the reports were intended to make sure that services were provided at the lowest cost. The contractual reference to "lowest cost" was to ensure competitive bidding among respondents to the RFP to get the contract, not to create an ongoing obligation to each subsequent signatory once the agreement was in place. *See* Motion, at 9:24–10:26; Ex. B to Cameron Decl. at § 5 ("Cost is a primary criterion for the selection process. *Proposals will be evaluated* based on the lowest estimated net total cost to WSCA and each individual participating entity . . . ." [emphasis added].) Furthermore, the WSCA contracts prohibited AT&T from unilaterally changing plans. *See* Ex. B to the Cameron Decl., WSCA I RFP at § 3.1.7 ("Only the [participating entity representative] shall be allowed to manage accounts and service/equipment ordering"); *see also* WSCA II RFP at § 3.1.3, attached hereto as Ex. F to the Reply Declaration of W. Scott Cameron ["Cameron Reply Decl."] ("Only the participating entity representative shall be allowed to manage accounts and

4

service/equipment/accessory ordering").  The alternative would be to read the contract to require never-ending negotiations between AT&T and every signatory to the WSCA contracts to adjust cost, but that makes no sense.

**B.    The Complaint Itself Contradicts the City's Assertion That Its CFCA Claims Were Adequately Pled**

"Patterned on [the federal False Claims Act]" ("FCA"), the CFCA permits recovery from any person who "[k]nowingly presents or causes to be presented [to the state or any political subdivision] . . . a false claim for payment or approval."  Cal. Gov't Code § 12651(a)(1); *City of Pomona v. Superior Court*, 89 Cal. App. 4th 793, 801 (2001).  To properly state a CFCA claim, a plaintiff must allege, among other things, (1) an objectively false claim that has been (2) knowingly presented.  The City has not adequately alleged either

First, even if AT&T were required to provide optimization reports and wireless services at the lowest cost available, the City has not adequately pleaded an objectively false claim.  In its Opposition, the City tries to argue that even though AT&T admittedly provided usage reports in multiple forms, it never intended to provide optimization reports.  Opposition, at 9:27–10:1.  But it is undisputed that AT&T responded to the WSCA I RFP by stating that it would comply with reporting requirements through WIN CDs and a dedicated project manager.  Complaint, at ¶ 111.  It is also undisputed that AT&T's response to the RFP was incorporated into the WSCA agreements.  *Id.* at 62, 67–68.  Finally, it is undisputed that AT&T provided WIN CDs, access to its Premier Portal, and Stewardship Reports.  Opposition, at 9:12–17.  The City itself describes these reports as "related to rate plan selection," "usage reports," and overage reports which identified "lines that exceed plan allowances."  *Id.* at 3:11–18.  By the City's own admissions then, AT&T provided information that could have been used to optimize rate plans.  The City, however, does not explain what it did with the data AT&T provided, or how exactly that data fell short of its contractual expectations.  That the City now claims—for the first time—that the information was insufficient does not turn otherwise legitimate reporting into fraud, especially where the reporting was of the *exact* kind identified in AT&T's RFP response.  AT&T's RFP response indicated that it would provide certain data, and it did.

5

Second, with respect to scienter—a showing of which is "critical" to the CFCA—the City takes issue with the pleading standard identified in AT&T's Motion.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  The City appears to argue that *Knudsen v. Sprint Commc'ns Co.*, 2016 WL 4548924 (N.D. Cal. Sep. 1, 2016), was incorrect because it analyzed scienter under *Tellabs*.  *Knudsen*, however, is both good law and based on facts identical to this case – the same Relator, the same contracts, and the same allegations.  *See* Ex. A to the Cameron Decl.  But even under the City's preferred pleading standard, its Complaint does not adequately plead scienter.  Because AT&T gave the City multiple reports which allowed it to analyze "rate plan selection," "usage," and "overages," the City cannot allege that AT&T "intended to flout" its obligations "from the very beginning."  *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).

### 1.        The City's Preemptive Arguments About Materiality Fail

The City preemptively argues that it has adequately pleaded materiality.  It has not.  To adequately plead materiality, a plaintiff alleging a CFCA claim must show that the alleged falsity has the "natural tendency to influence agency action or is capable of influencing agency action." *San Francisco Unified School Dist. ex rel. Contreras v. First Student*, 224 Cal. App. 4th 627, 639 (2014) (citations omitted).  "[M]ateriality is satisfied . . . only where compliance is 'a *sine qua non* of receipt of state funding.'"  *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (citations omitted).  Plaintiffs face a "rigorous" and "demanding" standard when pleading materiality, and a case may be disposed of on a motion to dismiss if it does not adequately plead materiality.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002, n.6 (2016).  In particular, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003-04; *see also United States ex rel. Kolchinsky v. Moody's Corp.*, 2017 WL 825478, at *5–6 (S.D.N.Y. 2017) (granting motion to dismiss FCA claims where government was aware of facts giving rise to the alleged fraud, yet continued to pay for defendant's credit-ratings product); *D'Agostino v. EV3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) (noting that, under *Escobar*, continued

6

payment "casts serious doubt on the materiality of the fraudulent representations that [plaintiff] alleges").  The City relies on *United States ex rel. Campie v. Gilead Sciences*, 862 F.3d 890, 902 (9th Cir. 2017), in arguing that AT&T fraudulently induced the City to sign the contracts because it "had no intention of complying with the optimization provisions contracts when it agreed to them."  Opposition, at 13:8–14.  *Gilead*, however, recognized that promissory fraud requires the alleged fraud be "material to the government's decision to pay."  *Gilead*, 862 F.3d at 902.  Not so here.  The City continued to pay AT&T long after it became aware of the alleged reporting deficiencies.  Further, *Gilead* stated that under an implied false certification theory of liability— which is "very similar" to promissory fraud—the perpetrator "must not merely request payment, but also must make specific representations about the goods or services provided."  *Id.; see also United States of America ex rel. Steven Mateski v. Raytheon Company*, 2017 WL 3326452, at *6–7, fn. 4 (C.D. Cal. August 3, 2017) (distinguishing *Gilead* where plaintiff only "identifies vague and broad contract standards that [defendant] allegedly did not meet over an eight-year period").  The City cannot allege any "specific representations," because there are none.

Here, the City continued to pay AT&T's invoices even after hiring third-party consultant CBC and after purportedly realizing that it was not receiving the reports to which it belatedly believes it was entitled.  *See* Complaint, at ¶ 140; Opposition, at 19:10–17.  In its Opposition, the City insinuates that CBC's mere hiring demonstrates materiality, but its actions after receiving the consultant's report prove the contrary.  Not only did the City not tell AT&T about any perceived reporting deficiencies, it renewed its contract two years later.  Complaint, at ¶ 94.  The City's conduct throughout the relevant time period "signaled no change in [its] position," and thus the City cannot demonstrate materiality.  *Escobar*, 136 S. Ct. at 2003-04.

**C.   The City Continues to Fall Short of Pleading the Who, What, When, Where, and How of a False Claim with the Particularity Required Under Rule 9(B)**

Federal Rule of Civil Procedure 9(b) requires that plaintiffs plead the "who, what, when, where, and how" of a false claim with particularity.  *See Cafasso,* 637 F.3d at 1055.  The City has not.  Instead, it points to the length of its Complaint as if to suggest that a long Complaint is inherently a specific complaint.  Opposition, at 16:22–23.  Not so.  No more than 20 of the 166

7

1   paragraphs even mention AT&T directly, and many of those contain no allegations at all.

2   Instead, the overwhelming majority of the City's Complaint impermissibly refers to the carrier

3   defendants as a unit.  Indeed, none of the City's causes of action are specifically pleaded toward

4   the individual carriers, and all its relevant section headings pertain to "Carrier Defendants."  But

5   Rule 9(b) prohibits precisely that sort of undifferentiated amalgamation.  It "does not allow a

6   complaint to merely lump multiple defendants together but requires plaintiffs to differentiate

7   their allegations when suing more than one defendant and inform each defendant separately of

8   the allegations surrounding his alleged participation in the fraud."  *United States ex rel. Lee v.*

9   *Corinthian Colls.*, 655 F.3d 984, 997–98 (9th Cir. 2011) (quotations omitted).

10          As for the "who" of its Complaint, the City does not identify which AT&T personnel

11  allegedly (1) knew the contractual provisions were false, (2) intended to breach contractual

12  obligations, (3) submitted fraudulent invoices, and/or (4) provided inadequate reporting.  Instead,

13  the City contends that merely identifying a laundry list of "key personnel/staff" is enough.  It is

14  not.  Were the City's argument true, any party to a business relationship could defeat a motion to

15  dismiss by simply identifying company contacts, regardless of whether they perpetrated the

16  allegedly fraudulent conduct.  *See United States v. Fulton Cty., Georgia*, No. 1:14-CV-4071-

17  WSD, 2016 WL 4158392, at *7 (N.D. Ga. Aug. 5, 2016) (complaint did not satisfy Rule 9(b)

18  where plaintiff did not identify employees involved in regulatory violations or submission of

19  false certifications).

20          Rather than answer the "when" and "where" of its Complaint, the City addresses a

21  materiality argument that AT&T did not explicitly make.  Opposition, at 18:14–19:29; *see supra*,

22  Section III(B)(1).  In so doing, it leaves unanswered AT&T's argument that simply alleging the

23  submission of invoices that the City now claims were fraudulent does not establish  the "when"

24  and "where" of this alleged fraudulent scheme because the City continued to regularly pay those

25  invoices long after it became aware of the perceived deficiencies.

26          As to the "what" and "how" of its Complaint, the City fails to adequately explain how

27  contractual provisions that contemplate future performance were demonstrably false when

28  AT&T signed the agreement.  The City again claims that it "explains what constitutes rate plan

1    optimization" in the Complaint.  Opposition, at 20:12–14.  It doesn't.  Instead, the Complaint

2    states that the definition of "optimization reports" is known to all.  *See also* Complaint, at ¶ 6

3    ("They knew what rate plan optimization was, as it is a term often used in the industry …").

4    Conclusory assertions that AT&T "never intended" to provide or was "incapable" of providing

5    specific (but undefined) reports are not enough to plead knowing fraud, especially given the

6    City's acknowledgement that AT&T *did* provide rate plan selection and overage reports.

7    Opposition, at 3:10–18.  In essence, the City alleges that AT&T signed the contract knowing that

8    it never intended to provide the right sort of reports, without explaining what those "right"

9    reports are.  The City is certainly free to believe that AT&T didn't live up to its end of the

10   bargain, but that belief, without more, does not transform disagreement into fraud.

11   **D.      The City's Last-Ditch Request for Leave to Amend Should Be Denied**

12          In the alternative, the City asks that it be given leave to amend.  Opposition, at 20:16–17.

13   But the City acknowledged that "[a]mending the Complaint to add identical allegations for each

14   defendant might address AT&T's complaints, but it serves no practical purpose other than to

15   make the pleading longer."  *Id*. at 17:11–13.  The City's implicit acknowledgement that no

16   additional facts exist to cure the Complaint's deficiencies demonstrates the futility of

17   amendment.  Relator filed his complaint nearly four years ago.  If the City could have adequately

18   pleaded its fraud claims, it would have by now.  It has not.

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

**IV.     CONCLUSION**

2

Because the City's Complaint fails to satisfy Rules 8 and 9 and the CFCA, the contracts'

3

plain language contradicts the City's characterizations of them in the Complaint, and the City's

4

specific admissions negate any suggestion of fraud by AT&T, the Court should dismiss this case

5

with prejudice.

6

DATED:  August 24, 2017              **KING & SPALDING LLP**

7

8

By:  */s/ W. Scott Cameron*
                                                W. SCOTT CAMERON

9
                                                JOHN C. RICHTER
                                                Attorneys for Defendant

10
                                                NEW CINGULAR WIRELESS NATIONAL
                                                ACCOUNTS, LLC D/B/A CINGULAR

11
                                                WIRELESS, NOW KNOWN AS AT&T
                                                MOBILITY NATIONAL

12
                                                ACCOUNTS LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10